Mary Gaydos, Minor, by Michael Gaydos, Her Father and Next Friend, Appellee, v. George Peterson and Anna Peterson, Appellants.

Gen. No. 40,408.

Opinion filed April 26, 1939.

DELMAR J. HILL and CEDRIC C. HERRMANN, both of Chicago, for appellants.

IRVING STENN, PETER FITZPATRICK, and MARION J. HANNIGAN, all of Chicago, for appellee.

MR. JUSTICE HEBEL delivered the opinion of the court.

This action was instituted by the plaintiff by her next friend to recover damages for personal injuries alleged to have been sustained when the plaintiff, who was almost seven years of age, was struck at 49th street and Damen avenue, Chicago, Illinois, by an automobile driven by the defendant, Anna Peterson, and owned by her husband, the defendant, George Peterson.

The complaint alleges negligence and wilful and wanton misconduct. The case was submitted to a jury on the allegation of negligence alone. A judgment for $2,500 was entered on the verdict of the jury in favor of the plaintiff and against both defendants. It is from this judgment that the defendants appeal.

The accident, the subject of this controversy, occurred about 8:30 in the morning on March 2, 1937. The day was clear and the pavement dry. It appears from the evidence that the plaintiff was a minor, and that she was a pedestrian crossing from the west to the east side of 49th street on the north crosswalk of its intersection with Damen avenue. When the plaintiff stepped into the street the defendant Anna Peterson was approximately 55 to 65 feet north of the point where the plaintiff was then crossing. The plaintiff was walking east and arrived at a point in the middle of the southbound car tracks before she was struck.

The question as to the speed the car was going at the time of the accident is a controverted one. The plaintiff contends that the defendant was driving at a speed from 20 to 30 miles an hour at the time the plaintiff was struck. The plaintiff further controverts the defendants' evidence that she sounded a horn and gave warning of the approach of the automobile being driven by the defendant, and being a question of fact it was the duty of the jury to return a verdict upon the evidence as presented by the plaintiff as well as by the defendants.

The evidence in support of the plaintiff's case is that this minor at the time of the accident was a pedestrian —as we have already indicated—crossing from the west to the east side of 49th street on the north crosswalk of its intersection with Damen avenue. When the plaintiff stepped into the street it is claimed that the defendant was driving at a speed from 20 to 30 miles per hour, and at that time the defendant was approximately 55 to 65 feet north of the point where the plaintiff was crossing the street. At the time she was struck by the automobile she was struck by the front bumper and the left front headlight of the automobile. It is also suggested that the entire car passed over her; however, the wheels did not run over her. The car continued for a distance of about 10 feet after it passed over the plaintiff. There were no vehicles parked on the west side of Damen avenue north of 49th street. It is contended that the defendant did not sound a horn or give any warning of the approach of the aforesaid automobile. The distance from the west curb of Damen avenue to the west rail of the southbound car tracks was 13 feet, 3 inches, showing that the plaintiff walked the distance while within the vision of the defendant as she was driving the automobile. The brakes on the automobile were in good condition and moving at a speed of 20 miles an hour the car would stop in 19 feet, and at a speed of 25 miles an hour the car would stop in 22 feet, 9 inches. The plaintiff was picked up and taken into a store and was removed from there to the South Town Hospital, where she remained for a period of 10 days. It is alleged that the plaintiff sustained the following injuries: a "U" shaped laceration on the scalp which necessitated numerous sutures; severe bruise on the head in the area of the right eye which eye became entirely closed and remained so for a number of days. She was unconscious and remained

in a semi-conscious state for several days. There were numerous bruises about her body. She continued to receive medical attention after leaving the hospital for a period of several months and at the time of trial there was a "U" shaped scar which had become adhered to the skull; that she was suffering from excess lacrimation in the right eye and opacities in the vitreous and in the retina of the right eye.

The defendants, however, in opposition to the claim of the plaintiff, call attention to the following evidence: Mrs. Peterson testified that as she approached the intersection she saw the plaintiff standing on the sidewalk, and as a precaution she slowed down to 17 or 18 miles per hour; that she sounded the automobile horn not once but three times, and that she gave this warning when she was about 100 feet away from where the plaintiff was standing, and again about 40 feet and the last time when she was 3, 4, or 5 feet from the crosswalk. After each sounding of the horn the plaintiff was still standing in the same position. Then Mrs. Peterson looked to the left to see if there was anything coming out of 49th street from the east. Then looking to the front again she saw the plaintiff running to the southeast, around in front of the car, and she was then at a point a couple of feet from the right front fender. In the operation of the car Mrs. Peterson testified that she put on the brakes, including the emergency brake, and stopped within 4 or 5 feet. She testified that the car did not run over the child, but that the child immediately afterwards, starting from the left front fender, ran around the left side and to the rear of the stopped car.

It also appears from the evidence in the record that Mr. John Heller, called by the plaintiff, stated that he was driving north and as he approached the south edge of a viaduct near the place in question he saw the

plaintiff in the act of stepping off the curb and into the street; that she was on the north sidewalk, which is about 175 feet north of the south edge of the viaduct, and he testified he went 15 feet or so and then when the plaintiff was just 2 or 3 feet out into the street, he noticed the southbound car of Mrs. Peterson, and when he first saw the Peterson car it was north of the intersection, or about 50 feet north of the crosswalk where the plaintiff was. In Heller's opinion Mrs. Peterson's car was then going about 20 to 30 miles an hour. He testified he was driving his car 25 miles an hour, and as soon as he saw that the plaintiff was going to be struck he jammed on the brakes, and just about the moment of the impact he came to a stop with the front of his car even with the north edge of the viaduct; that at no time did he, Heller, see the plaintiff look to the north as she walked into the street; she was walking east, facing east, and was looking straight ahead. He could not recall whether the automobile slowed down before the impact or not. On cross-examination he changed his testimony and testified he knew that it did not slow down before the impact. Mrs. Peterson in her testimony said that she heard Heller after the police officer came, say to officer Collins: "This lady was not to blame because the child ran out suddenly from the curb without giving her a chance to avoid the accident. The lady was driving slow, or moderate and made a good stop." Heller, however, denied making this statement, but the defendants were corroborated by the police officer Collins, who was produced by the defendants. While the questions are ones of fact, the defendants contend that the verdict of the jury was against the manifest weight of the evidence; that the evidence introduced was by Mr. Heller and the defendant Mrs. Peterson, together with that of the police officer Collins, who

corroborated Mrs. Peterson's testimony that the statement was made regarding what was said at the time Mr. Heller talked to the officer.

A vital question to be considered is what, if any, effect the evidence of the medical experts may have had upon the jury who returned a verdict for the plaintiff.

The first objection that is called to our attention by the defendants is that the court erred in permitting, over objection, the testimony as to what the plaintiff told the medical expert the night before the trial, and they point to the direct examination of Doctor Hoeltgen, who testified regarding the test he made in the course of the examination for the purpose of testifying in this case. He was asked what his test consisted of and his findings. He answered: "The first test was on a chart twenty feet from the patient. That is, I have a mirror ten feet away and we have an object over the patient's head. We have letters and we ask them to tell us what letters she sees. We do this with one eye at a time. We cover one eye and test the opposite eye." Objection was then made by the defendants upon the ground that the evidence would be subjective evidence. The court permitted the answer, and the doctor, after this ruling, described how he made the test. He used different charts or cards with letters and figures on them and asked the plaintiff what letters or numbers she saw. He admitted that the only way he could tell she was unable to see was from what she told him. On the basis of her statements of what she could and could not see, he determined· that her vision in the right eye was 16–200ths and in the left eye 16–50ths. This meant, he said, that the left eye, which was not injured in the accident, had refractive errors that gave plaintiff only one-third or perhaps one-half of normal vision in that eye, and that

the right eye, the one bruised in the accident also had refractive errors that were apparently worse, although just how much of a defect in vision the figure 16–200ths indicates was not explained.

The defendants contend that obviously the evidence that the plaintiff had refractive errors, based upon her statements the night before trial, was extremely damaging to the defendants, and it was made doubly prejudicial by the doctor's subsequent testimony that, while he could not account for the refractive errors in the left eye, the refractive errors in the right eye might and could be caused by the accident, and they call to our attention the case of *Chicago & E. I. R. R. Co. v. Donworth*, 203 Ill. 192, where the court said: ". . . the physician testified that he tested the hearing of appellee's left ear by holding a watch at some distance from the ear and asking him whether he heard the ticking of the watch, and that the appellee said he did not; that he looked into appellee's ear with a speculum; that all he could tell from the examination made with the speculum was that the condition of the tympanum of the ear was such that it was his opinion the sense of hearing was somewhat affected, and that he knew his hearing was to some extent affected, and further testified that so far as it was possible to know, 'it is my opinion that he has lost the hearing of his left ear, and that opinion is based upon what he told me and what I saw; what I saw did not tell me that he had lost the hearing, but merely that it might be affected.' "

The defendant in that case moved to strike the testimony that the plaintiff had lost the power of hearing in his left ear, and the court on this question said: ". . . The opinion expressed by the physician that the appellee had lost the power of hearing in his left ear was, it is clear, based upon the declarations of the

appellee to the physician, and it was error to overrule the appellant companies' motion to strike such opinion from the evidence. The effect of these rulings of the court was to authorize the jury to regard as proven that the appellee had lost the sense of hearing in his left ear and to award appellee damages accordingly. Thus appellee was allowed to enhance his damages by proof of his own self-serving and incompetent assertions.''

This ruling has been approved by authorities from time to time, and it is the law that the physician who examines a party to litigation the night before trial is not qualified under the rule to consider the evidence of the plaintiff in determining the extent of the injuries she may have suffered. We, of course, understand that this physician was not the attending physician, but made an examination the night before for the purpose of testifying. This rule is supported by the case of *Shaughnessy v. Holt*, 236 Ill. 485; *Chicago Union Traction Co. v. Giese*, 229 Ill. 260; and *Chicago City Ry. Co. v. Mauger*, 128 Ill. App. 512.

The further question was presented that the court erred in denying the defendants' motion to strike out testimony concerning the mere probability of future disability, and the defendants suggest that one of the consequences of the accident claimed by the plaintiff was the existence of opacities in the vitreous in her right eye. Those opacities and the unabsorbed hemorrhage on the retina were the only evidence of trauma that the plaintiff's expert claimed to find objectively in the eyeball the night before the trial. The doctor testified that opacities in the vitreous make vision somewhat blurred and sometimes people with opacities will see spots in front of their eyes. The defendants therefore claimed that the opacities were a substantial item in the injury claimed by the plaintiff, and that the

question of what degree or prospect of future disability, if any, the plaintiff was entitled to show by evidence, and to have damages assessed for, was exceedingly important, and point to the questions that were presented to and answered by Dr. Hoeltgen. One of the questions is: ''In your opinion to a reasonable medical certainty, is that a permanent condition—first of all, the vitreous, the opacities in the vitreous?'' to which the doctor answered: ''Yes. It is awfully hard to say that is permanent, but on the other hand it has been there a considerable time.'' This was objected to and the objection sustained by the court, after which this question was asked by the plaintiff's attorney: ''Have you an opinion, Doctor, to a reasonable medical certainty about the opacities in the vitreous of the right eye?'' to which the doctor answered: ''I would say that they may be permanent, but there is a chance that they may absorb.'' To this answer a motion was made by the defendants that it be stricken, which motion was denied. The defendants contend that their motion to strike was well-founded. When the doctor said the opacities may be permanent or may absorb, it was clear that he had, on the question of permanence, no opinion to a reasonable medical certainty, which was what he was asked and the only thing he could properly be asked. His answer showed that all he had in mind was a possibility, a conjecture, a mere speculation and the answer, if for no other reason, should have been stricken as unresponsive. The case of *Lauth v. Chicago Union Traction Co.*, 244 Ill. 244, which was cited by the defendants, seems to be in point upon this immediate question, wherein the Supreme Court said:

''In this class of cases, in estimating the pecuniary loss, all the consequences of the injury, future as well as past, which are shown by the evidence to be reasonably certain to result from the injury, are to be taken

into consideration. To form a proper basis for recovery, however, it is necessary that the consequences relied on must be reasonably certain to result. They cannot be purely speculative.'' And the court in that case reached the conclusion that the fact that a remittitur was entered and agreed to did not cure the error caused by the admission of evidence of the character before us. So we believe the court should have stricken the answers made by the doctor. At the same time it is difficult to determine just what effect this evidence would have had on the jury, and more especially since we have reached the conclusion that the evidence is rather close; that the record should be free from error, and that the jury must not be influenced by evidence that is improper to be considered. In view of that fact we believe the judgment should be reversed and the cause remanded.

Other questions have been called to our attention, but since there is to be a further trial it will not be necessary to consider them, as they are all before the parties who will present the litigation to the court and a jury.

*Reversed and remanded.*

Denis E. Sullivan, P. J., and Burke, J., concur.