HARRY GREEN, Plaintiff-Appellant, v. COOK COUNTY HOSPITAL *et al.*,
Defendants-Appellees.

First District (3rd Division)   No. 85—3668

Opinion filed May 27, 1987.—Rehearing denied July 16, 1987.

Edward J. Egan, John Patrick Healy, and Margaret M. O'Leary, all of Chicago, for appellant.

Richard M. Daley, State's Attorney, and Coffield, Ungaretti, Harris & Slavin, both of Chicago (Philip H. Mitchell, Assistant State's Attorney, and Joseph A. Cari, Jr., and James J. Stamos, of counsel), for appellees.

JUSTICE WHITE delivered the opinion of the court:

Plaintiff Harry Green appeals from the judgment entered on a jury verdict in favor of the defendants. The defendants are Cook County Hospital, the attending neurosurgeon, and the chief neurological resident. Green charges defendants with medical malpractice during surgery performed on him for the removal of a pituitary tumor.

Plaintiff suffers from acromegaly, a condition which results in abnormal growth of the head, thorax, hands, and feet, caused by a hyperactive pituitary gland. In Green, this hyperactivity was caused by a nonmalignant pituitary tumor. Green alleges that after defendants performed surgery on November 5, 1985, to remove the tumor, he suffered severe and permanent brain damage which impaired his coordination in all extremities, caused a loss of ocular motor control, and left him permanently disabled.

The pituitary gland is housed by the sella turcica (sella), which is a bony structure located in front of the brain stem, between the eyes. The surgical approach to the sella is known as the midline approach since the surgeon must stay on the midline of the head to reach the sella, which contains the pituitary. If he deviates from the midline, he will not be properly positioned in the surgery when the sella is to be

entered and the tumor removed.

The sphenoid sinus may contain thin walls of bone, known as septa, which divide the sinus into chambers. If the septa are present, they are broken during the surgery in order to reach the floor of the sella. To help the surgeon stay on the midline during this surgery, radiological indicators of the positions of the septa in the sphenoid sinus are used. Plaintiff based his case both on the theory of *res ipsa loquitur* and on specific allegations that the surgery was negligently performed in one or more of the following respects: (1) defendants did not enter the sella, but entered the subarachnoid space and introduced bacteria and caused a bacterial meningitis which resulted in brain damage; (2) defendants did not enter the sella, but entered the subarachnoid space and introduced blood cells which caused an aseptic meningitis and resulted in brain damage; or (3) defendants did not enter the sella but entered the subarachnoid space in a manner which caused injury to the brain stem and resulted in brain damage. Defendants' post-operative report of plaintiff's surgery stated that the bony septa that existed within the sphenoid sinus were removed and that the sella was reached and the tumor was removed. No difficulty was noted. The report indicated that facia lata and fat were packed into the sella cavity and adhesive was used to reseal the floor of the sella at the conclusion of the surgery.

Three tissue samples removed during the surgery were sent to the Cook County Hospital pathology department, which found that none of these samples contained tumor tissue. One of the samples was found to contain brain tissue. There was no lowering of Harry Green's growth hormone level following the November 5, 1981, surgery. CAT scans taken shortly after this surgery revealed the continued presence of septa in the sphenoid sinus.

A second surgery was performed by Dr. Michael Jerva in June of 1984. Again the purpose was to remove a pituitary tumor causing acromegaly. This second surgery was performed by Dr. Jerva upon his belief that the first surgery had not removed the pituitary tumor from Harry Green. Dr. Jerva was successful in reaching the sella and pituitary in this second surgery. He observed no evidence that the sella had been previously entered or that pituitary tumor tissue had been removed. Nor did he find fat in the sella during the second surgery when he entered it.

Pathology reports of the tissue removed by the second surgery indicated the presence of tumor tissue and pituitary tissue. They did not indicate the presence of any brain tissue. Bone removed from the floor of the sella during this second surgery contained neither tumor

nor adhesive.

There was a lowering in plaintiff's growth hormone level following the second surgery. Dr. Curtis, who performed the initial portion of the second surgery, testified that he observed apparently undisturbed septa in the sphenoid sinus and signs of what he took to be scarring from the first surgical procedure off the midline.

Defendants maintained that any brain damage suffered was a result of a bacterial meningitis which arose as a complication of a correctly performed surgery and not from any deviation from the applicable medical standard of care during surgery. Meningitis is recognized as an inherent complication of this surgery in 2% to 7% of cases.

The jury denied plaintiff's claim and found in favor of the defendants. Plaintiff now appeals, raising six issues on review: (1) that the evidence mandates the entry of judgment *n.o.v.* or new trial; (2) that the closing argument of the defendants in accusing plaintiff's counsel of making a lawsuit and manufacturing evidence severely prejudiced the plaintiff and constituted reversible error; (3) that it was improper for the court to instruct the jury that a poor result of surgery is not proof of negligence where a *prima facie* case under the doctrine of *res ipsa loquitur* has been established; (4) that the trial court improperly limited cross-examination of one of defendants' expert witnesses; (5) that misconduct of defense counsel constitutes error requiring a new trial; (6) that the trial court erred in refusing to submit a negligent supervision count to the jury and by excluding from evidence letters pertaining to such supervision.

■ Jury verdicts are not lightly set aside. However, where the case is a close one on its facts, as is the case before us, and errors made at trial appear to have had à significant effect on the outcome of the case, reversal is required.

> "It is not every error, of course, that will require a reversal. Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed. [Citations.] But where the case is a close one on the facts, and the jury might have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal." (*Both v. Nelson* (1964), 31 Ill. 2d 511, 514, 202 N.E.2d 494.)

(See also *Shehy v. Bober* (1979), 78 Ill. App. 3d 1061, 1071, 398 N.E.2d 80; *Gaydos v. Peterson* (1939), 300 Ill. App. 219, 20 N.E.2d 837.) We believe that in this close case the errors made at trial might

have so influenced the outcome of this case as to require reversal and remand for new trial.

■ First, it was error for the trial court to permit defense counsel to continue his accusations that plaintiff's counsel and Dr. Jerva, who performed the second surgery on plaintiff, manufactured a lawsuit from plaintiff's unfortunate situation. The jury must certainly have been affected by closing remarks such as the following:

"You know one of the other things that we talked about in opening statements was the making of lawsuit. And, it's unfortunate, because here is what plaintiffs' lawyers do. You have somebody in a very unfortunate situation.

\* \* \*

And you go back in time now, and now you pick and choose your facts. You pick and choose them and shape them the way you want, so now you can have a legal theory to recover money.

\* \* \*

Now, we are talking about in the making of a lawsuit how you start with someone who is in an unfortunate situation, and now you go back in time, and you're going to manufacture, you're going to control the facts. You're going to try to do what you can. But in this case, the plaintiff is—the plaintiff's lawyer has taken the ultimate control. He's taken the ultimate control of the facts. He's kept them from you.

\* \* \*

\*\*\* [I]t's not every lawyer in the making of a lawsuit that can take somebody who is in a bad situation, and you go back in time and start to reconstruct the facts. It's not every lawyer now who has the doctor hand in hand with him as he marches back in time and marches in the future to start manufacturing evidence."

This case is similar to *Paulsen v. Gateway Transportation Co.* (1969), 114 Ill. App. 2d 241, 252 N.E.2d 406, in which plaintiff's counsel accused the defense counsel of taking the facts out of context and trying to change the facts by trickery. (114 Ill. App. 2d 241, 245-46, 252 N.E.2d 406.) The *Paulsen* court condemned these remarks and reversed the judgment for the plaintiff.

We believe that the jury could not help but be influenced by the defense counsel's insinuation that plaintiff's counsel sought out an individual with an unfortunate illness and that he and Dr. Jerva combined their skills to create the appearance of a viable claim where none truly existed. In our view, there was no impropriety in plaintiff's

doctor performing the second surgery on the plaintiff and testifying to the results of this surgery at trial. We find that the characterization by defendants of this behavior as greedy attorneys and physicians combining to exploit the illness of a hapless plaintiff to be highly improper.

We also find error in the submission of defendants' non-IPI instruction to the jury. Supreme Court Rule 239 provides:

"Whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." (107 Ill. 2d R. 239.)

Here, the court gave, over defendants' objections, Illinois Pattern Jury Instruction Civil, No. 22.01 (2d ed. 1971) for *res ipsa loquitur*, which provides:

"The plaintiff has the burden of proving each of the following propositions:

First, that the plaintiff just before and at the time of the occurrence was using ordinary care for his own safety.

Second, that the plaintiff was injured.

Third, that the injury was received from an operation for the purpose of removing a pituitary tumor which was under the defendants' control.

Fourth, that in the normal course of events, the injury would not have occurred if the defendants had used ordinary care while the operation was under their control."

In addition, the court, over plaintiff's objection, gave this non-IPI instruction drawn from *Crawford v. Anagnostopoulos* (1979), 69 Ill. App. 3d 954, 960, 387 N.E.2d 1064, that stated:

"The fact that the plaintiff had a bad result from his surgery is not alone proof that the operating surgeons were negligent."

Plaintiff argues that the court erred in giving the non-IPI instruction once the *prima facie* case for applying the doctrine of *res ipsa loquitur* had been established. It would appear that there is no gainsaying plaintiff's contention that the giving of both instructions was confusing. The fourth paragraph of the *res ipsa loquitur* instructions permits the jury to conclude that plaintiff's "injury would not have occurred if the defendants had used ordinary care." On the other hand, the non-IPI instruction told the jury that the injury (the fact that the plaintiff had a bad result from his surgery) "is not alone proof that the operating surgeons were negligent," *i.e.*, did not use ordinary

care. Under the doctrine of *res ipsa loquitur*, the happening of an injury does indeed permit an inference of negligence where plaintiff produces substantial evidence that the injury was caused by an agency or instrumentality under the exclusive control of defendant and that the occurrence was such that in the ordinary course of things would not happen if reasonable care had been used.

Defendants argue that it was the giving of the *res ipsa loquitur* instruction, not the giving of the non-IPI instruction, that was error. It is defendants' argument that the giving of the *res ipsa loquitur* instruction violated section 2—1113 of the Illinois Code of Civil Procedure, which provides as follows:

> "Medical malpractice—res ipsa loquitur. In all cases of alleged medical or dental malpractice, where the plaintiff relies upon the doctrine of res ipsa loquitur, the court shall determine whether that doctrine applies. In making that determination, the court shall rely upon either the common knowledge of laymen, if it determines that to be adequate, or upon expert medical testimony, that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant. Proof of an unusual, unexpected or untoward medical result which ordinarily does not occur in the absence of negligence will suffice in the application of the doctrine." Ill. Rev. Stat. 1985, ch. 110, par. 2—1113.

■ In this brain surgery case, expert medical testimony was obviously necessary for the court to determine whether a trier of fact could conclude "that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant." Defendants contend that there was no such testimony. Our reading of the record does not support defendants' contention. There was evidence that during the operation defendant surgeons missed the sella, the site of plaintiff's problem. Defense witness Dr. Kalmon D. Post, a board certified neurosurgeon, admitted on cross-examination as follows:

> "Q. And, Doctor, is it correct that if a surgeon got lost, did not know he was lost, did not go to the sella but went into the patient's brain stem, that would be a deviation from the standard of care?
>
> A. I believe so."

We conclude that there was a factual basis for giving the *res ipsa loquitur* instruction and that giving in addition the non-IPI instruction was confusing and was error.

■ Finally, we believe that prejudicial error occurred where de-

fense counsel failed to complete impeachment of plaintiff's principal medical witness, Dr. Alan Hirsh. Dr. Hirsh testified that plaintiff suffers severe and permanent neurological impairments which cause plaintiff's incoordination, double vision, speech problems, inability to walk, and other neurological deficits. He believed that these conditions were consistent with trauma to the brain stem during surgery, and that plaintiff would become more functionally impaired as he ages.

Before he began his cross-examination of Dr. Hirsh, defense counsel stated in a sidebar conference: "I am just putting on the record because I am going to ask him questions if he would be surprised if Mr. Green could do certain activities today. And I will connect it up later." Defense counsel then raised the following questions on cross-examination:

"Would it surprise you if Mr. Green could stand before you as I am right now?

\* \* \*

Would it surprise you today if Mr. Green picked his leg up and crossed it \*\*\*?

\* \* \*

Would you be surprised if Mr. Green would walk from where you are to where I am right now by himself without crutches?

\* \* \*

Can Mr. Green, would it surprise you if Mr. Green by himself would get out of a wheelchair and walk the distance between where you are sitting and I am standing, and then sit down in another kind of chair? \*\*\* and do it in a normal fashion?

\* \* \*

Would it surprise you if somebody said, 'I saw Mr. Green pick up a bottle of baby oil and squirt it in his hands and kind of rub it all over himself,' would that surprise you?"

Dr. Hirsh indicated that he would be surprised if Harry Green could perform those functions normally. There was no evidence tendered subsequently that plaintiff could do these things. The trial court denied plaintiff's motion for a mistrial and sanctions for this incomplete impeachment.

Innuendo through incomplete impeachment is highly prejudicial. (*Rigor v. Howard Liquors, Inc.* (1973), 10 Ill. App. 3d 1004, 1009, 295 N.E.2d 491.) Once a defense counsel by cross-examination lays a foundation for impeachment, he is under an obligation to produce impeaching evidence. "If he fails to meet this obligation, the trial court must strike any applicable cross-examination and instruct the jury to

834

disregard it, or, at the insistence of the plaintiff, declare a mistrial." (*Danzico v. Kelly* (1969), 112 Ill. App. 2d 14, 25-26, 250 N.E.2d 801; see also *Bailey v. City of Chicago* (1983), 116 Ill. App. 3d 862, 452 N.E.2d 680.) Defense counsel's remarks were intended to lead the jury to believe that Harry Green could stand, walk without crutches, and rub baby oil all over himself. It is improper to make such remarks without introducing any evidence to support them.

We believe that the insinuations contained in the incomplete impeachment, the error in instruction on the issue of negligence, and the improper charges of manufacturing a lawsuit in defense attorney's closing argument combined to deprive plaintiff of a fair trial and require that the judgment for defendants be reversed. We do not find, as plaintiff contends, that the evidence merits a judgment *n.o.v.* We therefore remand for a new trial.

Reversed and remanded.

RIZZI and QUINLAN, JJ., concur.