THOMAS LEE, d/b/a Lee's Kitchen Distributors, Plaintiff-Appellant, v. RICHARD CALFA *et al.*, Defendants-Appellees.

Second District   No. 2—87—0985

Opinion filed August 24, 1988.—Rehearing denied September 30, 1988.

James T. Magee, of James T. Magee & Associates, of Round Lake, for appellant.

Louis W. Brydges, Jr., and Karin C. Bergener, both of Brydges, Riseborough, Morris, Franke & Miller, of Waukegan, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Thomas Lee, d/b/a Lee's Kitchen Distributors, filed suit in the circuit court of Lake County against defendants, Richard Calfa, individually, and Calfa-Pacchini Insurance, Inc., an Illinois corporation, alleging contract breach and negligence by defendant insurance agents in securing proper insurance coverage of plaintiff's business premises and the personal property contained therein. Plaintiff complained that the total recovery due him under the terms of the insurance policy procured for plaintiff by defendants failed to provide plaintiff with the actual full replacement value of his premises and personal property which were totally destroyed by fire. Plaintiff sought relief in the amount of his actual damages.

A jury rendered a verdict in favor of defendants, and the trial court entered judgment thereon. Subsequently, plaintiff filed a post-trial motion seeking judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied the motion, and plaintiff appeals. On appeal, plaintiff contends: (1) that the jury verdict was against the manifest weight of the evidence; (2) that the trial court committed reversible error in giving defendants' instruction relating to the testimony of expert witnesses; and (3) that the conduct of defendants' counsel was grossly inflammatory and prejudicial, depriving plaintiff of a fair hearing on the merits of his complaint.

Testimony at trial showed that defendant Calfa had been plaintiff's insurance agent since at least 1978. During that time, Calfa had procured insurance for plaintiff covering his business premises, including replacement coverage of the property in the event of loss due to a fire. On November 19, 1984, plaintiff's business premises, consisting of a barn and a metal addition thereto, and its contents were completely destroyed by fire. According to plaintiff's testimony, the value

of his property at the time of the loss was somewhere between $276,000 to $334,000 for the building and $190,000 to $242,000 for the contents. Plaintiff stated that he recovered only $201,000 on the building and $100,000 on the contents.

Plaintiff testified that he had told Calfa that he wanted his business property fully covered and that he relied on Calfa to obtain such coverage. According to plaintiff, Calfa had told plaintiff that with replacement cost insurance and certain policy endorsements, plaintiff was well covered. Plaintiff stated that every time he inquired of Calfa whether plaintiff had sufficient insurance on his building and the contents, Calfa informed him that plaintiff had plenty of coverage. In particular, plaintiff recalled that he phoned Calfa when the value of his increased stock of premade kitchen cabinets went from about $30,000 to $75,000 in value to find out if his insurance was sufficient to cover this additional stock. Defendant told plaintiff he definitely had enough coverage.

Plaintiff also testified that when he remortgaged his building, the bank had it appraised at between $275,000 and $300,000. It was plaintiff's testimony that he subsequently asked Calfa if his insurance was sufficient to cover a $300,000 building and that Calfa replied that with replacement cost insurance and the applicable inflation clauses, plaintiff had plenty of coverage.

On cross-examination plaintiff was asked if he continuously complained to Calfa about the rising cost of insurance. Plaintiff responded that he was "concerned about the price" but that he would not characterize his comments as complaints.

Plaintiff stated that prior to the fire, Calfa never explained the limits of the insurance policy on plaintiff's business premises. Defense counsel then introduced plaintiff's deposition wherein plaintiff had admitted that the concept of limits had been explained to him "in a very vague way." Plaintiff stated that Calfa told him to keep Calfa informed about what plaintiff was doing so Calfa could make sure plaintiff was covered.

Defendant, Richard Calfa, testified that plaintiff "got upset" every time his insurance premium increased, that plaintiff was "extremely concerned about costs," and that plaintiff "didn't like buying insurance." Calfa also related that he relied upon plaintiff for determining the value of his property and that plaintiff told Calfa that the metal addition on the original barn structure cost $60,000 to construct. A guidebook used in the insurance trade indicated that the cost of the building was $80,000 or $90,000.

Calfa stated that plaintiff tried to convince Calfa that $120,000

would cover the reconstruction of the barn and its addition. Calfa stated that he explained to plaintiff that his coverage had to equal his mortgage as well as satisfy the coinsurance clause of the insurance policy. To assure plaintiff the $120,000 he indicated would meet the rebuilding costs of the building, Calfa convinced plaintiff he needed to acquire coverage in the amount of $175,000. According to Calfa, plaintiff referred to this amount as a "rip off." Calfa said he was not able to convince plaintiff to obtain more than $175,000 in coverage. Calfa testified that plaintiff never expressed any skepticism to Calfa regarding the possibility of rebuilding his building for $175,000 if a total loss occurred. Calfa pointed out that any skepticism of this nature would have provided him with the opportunity to sell plaintiff more insurance, and the more insurance plaintiff bought the more money Calfa would make.

Also, Calfa stated that plaintiff had never shown him or talked to him about a bank appraisal of plaintiff's property. Calfa related that had plaintiff informed him of an appraisal, Calfa would have relied upon that appraisal to tell plaintiff he needed more insurance.

John Ingram, a professor at John Marshall Law School and a former insurance broker from 1950 to 1970, testified on plaintiff's behalf. Plaintiff's counsel proposed a hypothetical question regarding whether an insurance agent owed any duty to a client requesting insurance coverage for full replacement of his business premises and contents, without depreciation of the property, in the event of fire loss. The witness responded that he thought the agent would owe the client the duty of attempting to aid the client in determining the proper amount of coverage. According to Ingram, there was no single customary or appropriate manner for determining such coverage, but rather several methods could be used, such as having an appraisal made, using the original construction costs, if referring to a building, or calculating, by the use of valuation tables, the square-footage basis for the type of construction involved. The value of the business contents could be determined by both the cost of manufacturing the products involved and the probable retail sale value.

On cross-examination, Ingram stated that whether Calfa did a disservice to plaintiff depended, in large part, on whether Calfa was acting as an insurance consultant or as an insurance agent. Ingram said that his opinion of Calfa's duty was based on the witness' belief that Calfa was in an advisory position to plaintiff. Ingram agreed that the insured has the "last say" in determining the limits and amounts of insurance he is going to carry. The witness also agreed that if a replacement cost insurance policy provided for the replacement of a

building of comparable utility, the insured would receive the coverage for which he had paid.

Also testifying on plaintiff's behalf was Dan Daniel, a public adjuster hired by the plaintiff to determine the cost of replacing the building lost in the fire. Daniel's replacement figure amounted to $334,600.81, which the witness admitted was based on union labor. Daniel stated that he did not know whether the building being replaced would be built by union labor, and, if not, the replacement figure of $334,600.81 would be reduced by approximately 50%.

During Calfa's testimony he stated that Daniel's drawing of the building, upon which Daniel based his replacement estimate, was inaccurate. According to Calfa, the interior design of the building and the utilization of the space within differed from that represented by Daniel's drawing. Calfa testified that he had been to plaintiff's premises in October 1984, about one month prior to the fire, and had not noticed any changes in plaintiff's building. However, Calfa also stated that he had only walked through the doorway of the building into plaintiff's office. He did not recall going through the building.

Richard Pacchini, an insurance agent with defendant Calfa-Pacchini Insurance, Inc., and Calfa's partner, testified that he had known Calfa about 10 years. Pacchini described Calfa as a cautious insurance agent who wants to do the "right thing" for his client. Pacchini recalled a conversation with Calfa wherein Calfa related that plaintiff wanted to insure his metal addition to the barn structure for $60,000. Pacchini believed this replacement figure was inappropriate because it only included the cost of materials; it did not include the cost of the actual construction.

Pacchini found it unbelievable that Calfa would have told plaintiff he did not need any more insurance if plaintiff had told Calfa he could not replace the building for $175,000 as plaintiff testified. The witness also did not find it believable that Calfa would have failed to write insurance on plaintiff's building for $275,000 if, in fact, plaintiff had had an appraisal in that amount and informed Calfa of it. As Pacchini explained, writing plaintiff's policy in a larger amount would have generated more commission dollars for Calfa and, consequently, more earnings.

William Hall, an insurance adjuster representing the Hanover Insurance Company, plaintiff's insurer, on property claims and assigned to adjust plaintiff's claim for fire loss, testified for Calfa. Hall submitted several reports to Hanover to alert the company regarding the potential damages to plaintiff's premises. Hall's first report estimated plaintiff's loss at $232,000 for the building. Due to subsequent docu-

mentation submitted by plaintiff, this figure was later refined to $269,000.

Hall stated that he had received a copy of the report prepared by Dan Daniel, the adjuster hired by plaintiff. Hall disagreed with Daniel's computations and final replacement figure, finding Daniel's report poorly written, duplicative, and overestimated. Hall maintained that Daniel's replacement figure was overstated by at least $94,000.

Donald Tomek, an insurance agent with his own agency in Waukegan, testified regarding the practices of insurance agents in Lake County. Tomek stated that the value of property for coinsurance purposes could be determined in several ways: for example, by using books setting forth guidelines for computing approximate replacement costs of a building, by using building costs if a building had been recently constructed, or by getting a qualified appraisal. According to Tomek, most insurance agents in the county would not recommend an appraisal in determining the proper insurance coverage for a building. Tomek stated that he would not normally recommend an appraisal when purchasing insurance for a building valued under $500,000.

Tomek testified that the limits on a policy ultimately rest upon the insured and that an insured scarcely asks for an adjustment in limits because an adjustment would cost the insured more money. Tomek related that he had reviewed Calfa's file on plaintiff, had reviewed Professor Ingram's deposition, had talked to Calfa, and had reviewed Hanover's claim file. Based on all these, Tomek was of the opinion that Calfa had acted properly.

At the conclusion of all the evidence defendant moved for a directed verdict on all three counts of plaintiff's complaint. The court granted the motion as to count III, the willful and wanton misconduct allegation, and denied the motion as to count I, the breach of contract allegation, and count II, the negligence allegation.

At the conference on jury instructions plaintiff objected to defendants' instruction No. 5, which stated:

"In procuring insurance on behalf of a customer, an insurance agent must possess and apply the knowledge and use the skill and care that is ordinarily used by reasonably well-qualified insurance agents in Lake County, Illinois, or in similar localities in similar cases and circumstances. A failure to do so is a form of negligence.

The only way in which you may decide whether the defendant possessed and applied the knowledge and used the skill and care which the law required of him is from the evidence presented in this trial by insurance agents called as expert wit-

nesses. You must not attempt to determine this question from any personal knowledge you have."

According to the bystander's report of the instruction conference, plaintiff argued that no instruction as to expert testimony was appropriate in the instant case, that the instruction improperly directed the jury to consider only expert testimony and infringed upon the province of the jury, that the instruction misstated the law applicable to the instant case, and that the instruction, a purported modification of Illinois Pattern Jury Instructions, Civil, No. 105.01 (Illinois Pattern Jury Instructions, Civil, No. 105.01 (2d ed. 1971)) intended for use in medical malpractice cases, was misleading, as the issues in the instant case were not akin to medical malpractice cases requiring expertise beyond the comprehension of laymen.

Defendant responded that the instruction was appropriate in any case where professional standards of care were in issue, that the standard and practices among insurance professionals were beyond the knowledge and understanding of laymen, and that the jury may decide whether defendant Calfa used the skill and care required by law based only upon the testimony of expert witnesses.

The trial court ruled in favor of the defendants and stated that the instruction would be given over plaintiff's objection.

Following its deliberation, the jury found in defendants' favor. The plaintiff filed a post-trial motion seeking judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied the motion, and this appeal followed.

We first address plaintiff's contention that the trial court committed reversible error in giving defendants' instruction No. 5 relating to the testimony of expert witnesses. That instruction stated:

"In procuring insurance on behalf of a customer, an insurance agent must possess and apply the knowledge and use the skill and care that is ordinarily used by reasonably well-qualified insurance agents in Lake County, Illinois, or in similar localities in similar cases and circumstances. A failure to do so is a form of negligence.

The only way in which you may decide whether the defendant possessed and applied the knowledge and used the skill and care which the law required of him is from the evidence presented in this trial by insurance agents called as expert witnesses. You must not attempt to determine this question from any personal knowledge you have."

Defendants' instruction No. 5 is Illinois Pattern Jury Instructions, Civil, No. 105.01 (2d ed. 1971) (hereinafter IPI Civil 2d No. 105.01) as

modified. IPI Civil 2d No. 105.01 appears in a series of instructions entitled "Malpractice" and dealing with "actions against persons who perform the art of healing," such as physicians, surgeons, and dentists. The instruction as it appears in IPI Civil 2d No. 105.01 states:

"In [treating] [operating upon] a patient, a [doctor] [dentist] must possess and apply the knowledge and use the skill and care that is ordinarily used by reasonably well-qualified [doctors] [dentists] in the locality in which he practices or in similar localities in similar cases and circumstances. A failure to do so is a form of negligence that is called malpractice.

[The only way in which you may decide whether the defendant possessed and applied the knowledge and used the skill and care which the law required of him is from evidence presented in this trial by [doctors] [dentists] called as expert witnesses. You must not attempt to determine this question from any personal knowledge you have.]"

The accompanying notes on the use of this instruction state that the second paragraph of the instruction "may be used only when the breach of duty complained of is not a matter of common knowledge." (Illinois Pattern Jury Instructions, Civil, No. 105.01, Notes on Use, at 319 (2d ed. 1971).) The modified version of IPI Civil 2d No. 105.01 tendered by defendants and given to the jury included this second paragraph. The jurors were instructed to consider only the testimony of insurance agents as expert witnesses in deciding whether Calfa employed the proper duty of care in procuring sufficient insurance for plaintiff's building and contents.

The bystander's report of the conference on the instructions to the jury indicates that plaintiff's counsel specifically objected, in compliance with Supreme Court Rule 239(b) (107 Ill. 2d R. 239(b)), to defendants' instruction No. 5. Plaintiff argued that no instruction as to expert testimony was appropriate in the instant case, that the instruction improperly directed the jury to consider only expert testimony and infringed upon the province of the jury, that the instruction misstated the law applicable to the instant case, and that the instruction intended for use in medical malpractice cases was misleading, as the issues in the instant case were not akin to medical malpractice cases requiring expertise beyond the comprehension of laymen.

■ Instructions to the jury should not overemphasize any particular matter. (*Malek v. Lederle Laboratories* (1984), 125 Ill. App. 3d 870, 872.) In the instant case defendants' instruction No. 5 singled out a single piece of evidence, the testimony of insurance agents, and overemphasized consideration of it by the jury in reaching its decision.

We believe this was improper.

■ Furthermore, in a case of this nature such an instruction was unnecessary. In an action against an insurance agent for damages sustained as a result of the agent's alleged failure to obtain proper insurance coverage, expert testimony was unnecessary to establish a standard of care. See *Wheaton National Bank v. Dudek* (1978), 59 Ill. App. 3d 970; see also *Miller v. DeWitt* (1965), 59 Ill. App. 2d 38, *aff'd in part & rev'd in part on other grounds* (1967), 37 Ill. 2d 273 (wherein the court found erroneous an instruction providing that evidence presented by architects as expert witnesses was the only way the jury could determine whether the defendants' architects possessed and applied the knowledge and used the skill and care required of architects).

■ Also, as stated, defendants' instruction was directly in conflict with plaintiff's instruction No. 2, which instructed the jury to consider all of the evidence bearing on the issues without regard to which party produced it. Further, plaintiff's instruction No. 4 instructed the jurors to consider all of the evidence presented in light of their own observations and experiences while defendants' instruction No. 5 instructed the jurors not to consider any personal knowledge in determining Calfa's duty. It is not improper to assume that the jurors had at one time or another in their lives procured insurance through an insurance agent or had dealings with an agent in insuring property. We find it, therefore, unlikely that the jurors would have been unable to determine the duty of care required of Calfa by considering all of the evidence rather than being instructed to consider only the testimony of insurance agents who testified, especially when such testimony was, in theory, provided only by Calfa's witness, Donald Tomek.

The testimony of plaintiff's expert, John Ingram, reflected that as a professor of law, he had been teaching insurance law for about 20 years and agency law for approximately 15 years. Ingram had also written numerous articles dealing with insurance law. Despite his background in insurance law and his past experience of 20 years as an insurance agent, at the time of trial Ingram had not been licensed as an agent in nearly 15 years. Thus, on the basis of the directions set forth in defendants' instruction No. 5, Ingram's testimony could not be considered in determining Calfa's duty of care since Ingram was no longer an insurance agent.

■ The trial court has the discretion to determine which instruction shall be given, and the exercise of such discretion will not be disturbed on review unless it has been clearly abused. (*Clarkson v.*

*Wright* (1984), 121 Ill. App. 3d 230, 232, *rev'd on other grounds* (1985), 108 Ill. 2d 129.) The test of instructions is whether, considered as a whole and read as a series, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state principles of law which pertain to the case; a deficiency in one instruction may be cured by another. (*Hartness v. Ruzich* (1987), 155 Ill. App. 3d 878, 884-85.) Here, the case was close on its facts, and the jury had to choose between conflicting versions regarding the procurement of proper insurance coverage and the duty of care involved. Defendants' instruction No. 5, as stated, improperly directed the jury to consider only expert testimony and, therefore, infringed upon the province of the jury.

In light of the fact that defendants' instruction No. 5 conflicted with plaintiff's instructions Nos. 2 and 4 and that defendants' instruction emphasized one particular matter in Calfa's favor, thereby, in effect, precluding the jury from considering any evidence other than the testimony of Calfa's expert, we conclude that the giving of defendants' instruction No. 5 constituted an abuse of the trial court's discretion.

We next consider plaintiff's contention that the conduct of Calfa's counsel was grossly inflammatory and prejudicial, depriving plaintiff of a fair trial on the merits of his complaint, and that, therefore, the trial court erred in denying plaintiff's motion for a new trial.

It is the duty of the trial court to prevent prejudicial conduct at trial and to grant a new trial where such conduct has occurred. (*Bisset v. Village of Lemont* (1983), 119 Ill. App. 3d 863, 865-66.) Improper argument and misconduct by an attorney is a sufficient basis for the award of a new trial. (*Bisset,* 119 Ill. App. 3d at 865.) Where the question of liability is sufficiently close so that a jury might reasonably return a verdict for either party, it is necessary that the trial judge and attorneys conduct the trial so as not to improperly influence the jury; otherwise, a reviewing court must reverse the judgment. *Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 214.

As there was evidence in the record here to support a verdict for either party, it was important that the jury not be influenced by any improper conduct so prejudicial as to deprive either party of a fair trial. With this purpose in mind, we consider some, but not all, of the alleged improprieties complained of by plaintiff.

Our review of the record reveals that throughout the trial, defense counsel improperly created prejudicial inferences against plaintiff. During his opening statement, defense counsel pointed out to the jury that increasing insurance premiums are partially due to the pro-

liferation of lawsuits, thereby implying that plaintiff was contributing to this increase by filing suit against defendants. Additionally, counsel told the jury that anything plaintiff recovered in the instant case would be "pure profit" because plaintiff's building had been replaced with one of comparable utility. Counsel stated that plaintiff wanted "a palace," suggesting that plaintiff wanted more than he was entitled to under the terms of his insurance. Also during his opening statement, defense counsel referred to plaintiff as being "very tight with a dollar," as being a person who "drives a Corvette," and as having a business with a "gross of almost a million dollars a year." Counsel knew this latter statement to be false at the time he uttered it since counsel had received copies of plaintiff's 1980 to 1985 tax returns prior to trial.

During defense counsel's cross-examination of plaintiff, counsel suggested that plaintiff's testimony was impeached by prior inconsistent statements. However, the implied impeachment was either abandoned or objections were sustained. Innuendo through incomplete impeachment is highly prejudicial. (*Green v. Cook County Hospital* (1987), 156 Ill. App. 3d 826, 833.) Since the outcome of this case depended, in the main, upon whether the jury found plaintiff or Calfa to be the more credible and the implied impeachment was intended to lead the jury to doubt plaintiff's credibility, we find defense counsel's insinuations to be improper.

While any one of the complaints set forth above would not alone require reversal, when taken together with defense counsel's outrageous attack on plaintiff's expert witness, John Ingram, during closing argument, the complaints establish a pattern of conduct intended to thwart the orderly administration of justice. During closing, defense counsel told the jurors that they would be instructed by the court to consider the testimony of expert witnesses in determining whether Calfa deviated from any standard of care. Immediately following this comment, counsel stressed that plaintiff's expert, Ingram, advertised and sold his testimony, earning his living in part by testifying, and that plaintiff's counsel would not have hired Ingram if the witness' opinion would have been that Calfa was not at fault. By these remarks, defense counsel implied that plaintiff's counsel had not hired Ingram until he was certain of the opinion Ingram would give and that, in effect, plaintiff's counsel and Ingram conspired to manufacture false testimony. In direct contrast to these remarks, defense counsel then told the jurors that he had not instructed his expert, Donald Tomek, as to what opinion to reach and that Tomek was to be compensated regardless of the opinion he reached. We find counselor's

disparaging remarks both abusive and prejudicial.

In the instant case, we are not faced with only one or two small statements of impropriety but, rather, with many improper remarks, not all of which are mentioned in this opinion, in a record exceeding 600 pages. In our view, defense counsel's remarks cannot be classified as isolated and inadvertent as they reflect a persistent effort to prejudice the jury. Counsel's improper statements in the form of personal abuse of a witness and belittling of an adversary in closing argument as well as arguably improper statements in opening argument and improper and misleading questioning during trial combined with the giving of defendants' erroneous instruction No. 5 had the cumulative effect of substantially prejudicing plaintiff and depriving him of a fair trial.

Jury verdicts are not lightly set aside, but where a case is close on its facts, as is the case before us, and the jury might have decided either way, errors made at trial which might have had a significant effect on the outcome of the case require a reversal. (*Green*, 156 Ill. App. 3d at 829.) As it cannot be determined whether the jury might have returned a different verdict had the errors cited above not occurred, we conclude that plaintiff is entitled to a new trial. In view of this conclusion, we find it unnecessary to address plaintiff's first contention that the jury's verdict was against the manifest weight of the evidence.

Although we find that the trial court abused its discretion in denying plaintiff's motion for a new trial, we do not consider that the trial court erred in denying plaintiff's motion for judgment notwithstanding the verdict. The evidence in this case was closely balanced and was not so overwhelmingly in favor of plaintiff, when viewed in the light most favorable to defendant, to justify the entry of a judgment notwithstanding the verdict. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.

Based on the above reasoning, the judgment of the circuit court of Lake County upholding the jury verdict for defendants is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

DUNN and NASH, JJ., concur.