THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY CAMDEN, Defendant-Appellant.

Fifth District    No. 79-512

Opinion filed November 26, 1980.

Dennis J. Hogan, of Murphysboro, for appellant.

William B. Ballard, State's Attorney, of Jonesboro (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

A jury found the defendant, Larry Camden, guilty of the offense of involuntary manslaughter, a charge which arose out of the shooting death of a 19-year-old woman. After hearing considerable testimony from several witnesses, the grand jury had indicted defendant for the offense stating that he, "acting in a reckless manner, performed an act likely to cause death or great bodily harm to Susan Coats, in that he discharged a firearm [sic] in the presence of Susan Coats, causing a projectile from the firearm to strike Susan Coats, thereby causing the death of Susan Coats." Defendant was sentenced to imprisonment for three years and six months. From the judgment and sentence he appeals questioning the sufficiency of the evidence and numerous rulings of the trial court.

During the grand jury proceedings the defendant in the presence of his counsel chose not to testify, asserting his right under the fifth amendment to remain silent. At trial defendant presented no evidence. Over the course of two days, August 21 and 22, 1979, 19 witnesses testified for the State. According to an affidavit of the court reporter who was responsible for "[s]ome of the pre-trial motion hearings, arraignment proceedings, and the trial proceedings," "On November 17, 1979, a sack containing two stenographic notebooks and two tapes were taken from my car, apparently by a thief, and, as of this date [November 27, 1979], have not been recovered. Those notes and tapes contained a substantial part of the record in the above entitled cause." Pursuant to Supreme Court Rule 323(c) (Ill. Rev. Stat. 1979, ch. 110A, par. 323), which provides for a procedure to be followed if no verbatim transcript of the evidence of proceedings is obtainable, appellant submitted to the trial court a proposed report of proceedings. The trial court conducted hearings during which counsel for both parties agreed to the substance of the testimony of any witness at trial whose recorded testimony was unobtainable as a consequence of the alleged theft of the tapes and notebooks. The record on appeal indicates that all testimony heard by the trial jury was among the material lost. However, matters taken up by counsel in chambers are in verbatim form in the transcript of proceedings, as is the in-chambers

testimony of one of the witnesses who testified before the jury, Gordon Hoppe. This witness had taken from the defendant a handwritten statement during the morning of the day on which the incident occurred and, beginning shortly after noon of the same day, had taken a tape recorded statement from him. The witness testified in chambers for the purpose of enabling the court to determine the admissibility into evidence of the tape recording. Defendant's entire tape-recorded statement, which was admitted into evidence by the trial court and later played to the jury, was played in chambers prior to the trial court's ruling as to its admissibility and is therefore preserved verbatim in the transcript. Closing arguments, which were heard on August 23, 1979, are also preserved verbatim in the transcript. No issue is raised on appeal by either party with respect to the procedure used for setting forth in the record the substance of the testimony, the verbatim records of which are unobtainable, or to the accuracy of counsel's reconstruction thereof.

In his tape recorded statement the 35-year-old defendant said that about 2:30 or 3 in the afternoon on Saturday, February 17, 1979, the day before the incident occurred, he had gone to a bar called the Four Seasons. Later he went from that bar to another, the Tip Top, where he stayed until "after twelve" talking to Susan Coats' mother, to his cousin, Doris Camden, and to a man named Ralph Stroehlein. He said that "[r]ight after midnight" he left the Tip Top, taking with him a "fifth of Jack Daniels," and went to the "shelter care home" where Susan Coats was working. He said that he and "Susie sat over there and I had three or four drinks and maybe more, I don't know, and she was drinking wine," which, he said, she had provided. According to defendant, she also had "pot." He said that he and Susan Coats left the "nursing home" and went back to his apartment "[s]ometime after 5:00" in the morning. Asked by Gordon Hoppe, "And what did you guys do when you got to the apartment?" the defendant responded,

> "Run around, drinking, we was just running around, drinking, what the hell, you know, we were at the apartment there, we were running around drinking there, both shitting around, playing cowboys and indians. I told Susie not to mess with the bullets and not to load the gun there and blah blah this and blah blah that. I went in to get a beer, that's when I heard the shot, went back in there and Susie was trying to talk and that's when I called the ambulance."

Defendant said that the shooting occurred "[b]etween five and six o'clock." He said that he was uncertain of the time but that Susan Coats was relieved of duty at the nursing home "sometime between five and a little after there." He said that he had no watch. He explained that Susan Coats had the weapon at the time because "[w]e was playing with the

pistol." He stated that he had two pistols and that one was in the "left-hand upper drawer and one was in the middle drawer" of a bureau in the bedroom. He stated, "I don't know who got what, you know, we was playing around with it." Asked whether defendant and Susan Coats each had a gun, defendant answered, "Yeah. I laid mine down. I had the one with the 4″ barrel. I went in there to get a beer and that's when it happened." He said that they had been "wrestling around" in the bedroom and that the pistol with the two-inch barrel "just switched back and forth. We was playing with them guns, the shotgun there." He referred, he said, to a shotgun leaning against the wall of the bedroom. Asked, "So, you have no idea of how she loaded the gun?", he answered,

> "I didn't even know she even knew how to load one. I didn't. Now, she had been out to my house several times, and I was always fooling around with guns over there, but me and her has been out shooting the one gun and I let her shoot that. I showed her how to load that. I doubt if she knew. I don't know how in the hell she knew."

He stated that the gun he had shown her how to load was the one with the four-inch barrel. It cannot be determined from defendant's tape recorded statement whether the two guns required the same procedure for loading. Asked further, "Where do you think she got the shells?" he answered, "They was laying all over, there." By way of explanation he said,

> "It is probably, you know, see, I don't know for sure, it is, you know, like I had them in about four different drawers, the shells, and you know, where I got the small gun out and there was shells up there, shells in the middle drawer, and over the dresser, and should be shells in the right or left hand drawer."

Asked, "Was she laying [sic] down when you left her or was she sitting on the bed?" defendant answered that she was lying on the bed. He stated, "I left the Jack Daniels out in the truck, there, and I went to the icebox to get a beer and you know, I was going to start back in the bedroom" when the shooting occurred. He said, "The last thing, the last thing she said to me was, I am going to shoot you, you son of a bitch." He said he "laughed it off, you know, and I went in there and got a beer and, ___." He explained that she had made the remark to him because "[s]he was all the time joking around, she was always saying that." At the time of the shooting the victim was wearing a winter coat completely buttoned. With regard to that fact defendant stated, "She said she had to go back and check on something with her mom," who, he said, "was supposed to have been the one to relieve her" of duty at the nursing home. He added, "I never did see her [Susan Coats' mother], but she was."

Defendant stated that he had known Susan Coats for five years and that he knew her well. During the taking of the tape recorded statement,

Gordon Hoppe said in an attempt to explain to defendant, who worked on a riverboat, why he was inquiring into the nature of defendant's relationship with Susan Coats, "[W]e're trying to figure out why, you know, you haven't seen her for two and a half months and all of a sudden, you go down, you know. You were close friends, right?" To that statement defendant responded, "I am close friends with her mom, I am close friends with her uncle, I am close friends with her brother. I work on the boat with her uncle and brother." He said that he had stayed all night with Susan Coats when he first returned on February 6, 1979, 12 days before the incident occurred, and had seen her "[a]bout three days in a row" at that time. He stated that he had fired the smaller of the two guns the day before the incident "maybe three times."

Testifying for the State, Ellen Light stated that she had arrived at the nursing home to relieve Susan Coats at 5:50 a.m. She said that at that time Susan Coats left in a pickup truck in the company of a man later identified as defendant. Shortly after 6 a.m. defendant's neighbor saw him and Susan Coats arrive in a pickup truck and go up to defendant's apartment. Shortly after 7 a.m. two telephone operators each received a call for an ambulance from an agitated male caller. At 7:20 a.m. an employee of a local ambulance service received a similar call. The two medical technicians dispatched to the scene said that they did not disturb it in any way except to unbutton the victim's coat in order to check the victim's vital signs, which were absent. The young woman was lying on her back with an apparent gunshot wound of the head. Her arms were at her side with her palms down. A weapon later described as a Charter Arms .38-caliber revolver with a two-inch barrel was lying to the left of the victim. The medical technicians, as did other witnesses who were at the scene, noted the warmth of the small apartment.

James Ray, a Union County deputy sheriff, described the dead girl as lying across the bed in the bedroom on her back with the palms down and an apparent bullet wound to the area of the face. He testified that there was bleeding from the mouth and around the nose. In photographs admitted into evidence and included in the record on appeal we note that the body is lying with the face straight up and the legs hanging over the side of the bed. The arms are lying parallel with the body and close to it. The palms are down. There appears to be bleeding from the center of the face at the mouth and nose. The victim is wearing a winter coat which appears to be bulky. The witness testified that a short-barreled revolver was lying on the bed approximately two feet to the left of the body at approximately the level of the victim's chin. He said that he had been present when Gordon Hoppe took defendant's statement in which defendant stated that he was right-handed. The witness was later recalled and qualified as an expert in weapons whereupon he demonstrated to the

jury the method of loading five shells into the chambers of the weapon. According to the statement of testimony agreed upon by counsel, the expert witness took 50 seconds to load the weapon. However, in closing argument, which is transcribed verbatim, the State's Attorney argued variously that it took the expert 13 seconds and 15 seconds to do so.

A crime scene technician with the Illinois Department of Law Enforcement, R. L. Austin, testified that he measured the distance between the revolver lying on the bed and the girl's left shoulder and found it to be 15½ inches. He said that the revolver contained one fired and four live rounds of ammunition. A slug removed from the body on autopsy was later determined to have been fired from the revolver on the bed. He said that the gun was one with a light frame, which would recoil upon firing more than would a weapon with a heavier frame. He testified that the recoil would be substantial for such a gun and that the direction of the recoil would be "back and up, away from the discharge." The witness had performed tests on the hands of both victim and the defendant in order to determine whether the subject had recently fired a gun and had found the results of the tests inconclusive as to both victim and defendant. He said he had found in the snow at the nursing home a wine bottle which had not been there long, as evidenced by the fact that it was not covered with snow. He said he had found in the cigarette butts taken out of the trash of the nursing home no traces of marijuana.

Robin Dillon, a police officer, testified that during the search of the residence no open can of beer was found. The witness was recalled and testified that immediately to the left of the body a pillow was found which bore an indentation which appeared to have been caused by a heavy weight. The revolver was lying slightly under that pillow. The witness testified on cross-examination that he could not say with certainty that the gun had not bounced into that position. In the photograph already mentioned, a pillow appears next to the victim's left upper arm.

Richard Lingle, a police officer, had, together with Robin Dillon and Harry Johnson, an investigator for the Union County State's Attorney's office, interviewed defendant on the afternoon of the day on which the incident occurred. Defendant was notified of his rights and then asked to describe the occurrence. According to the witness, defendant testified that Susan Coats was lying on the bed with a gun when he left her in the bedroom and went to the refrigerator in the kitchen and got a beer, that Susan Coats apparently loaded the gun and that that was when the defendant heard the shot. The witness testified that ammunition was located in dressers and other areas within the bedroom and in the kitchen and the living room. The witness stated that defendant had said he had stopped at the doorway to the kitchen before leaving the bedroom and

had told Susan Coats not to load the gun and not to "jack with" the shells. According to the witness, defendant said that the girl had said that she was going to blow his head off. The witness stated that defendant had said that from the time of death of Susan Coats he had disturbed nothing around her or in the room.

Harry Johnson testified that on the afternoon of the day on which the incident occurred he and the two police officers took another written statement from defendant. The witness testified that after defendant had been advised of his rights, he stated that he and Susan Coats had been playing with guns and that the guns, which were his, were unloaded. According to the witness, defendant stated further that Susan Coats was lying on the bed on her back when he decided to walk into the kitchen, which immediately adjoined the bedroom, in order to get a beer. Defendant said, according to the witness, that he stopped at the doorway and, looking back, told Susan Coats, who was still lying on the bed, not to "mess" with any shells. The witness said that defendant stated he walked straight to the refrigerator from the bedroom door, got a beer and heard a shot. Defendant said, according to the witness, that he had then returned to the room to find Susan Coats gurgling as though she were trying to talk, blood spurting from her face. Defendant said that he then made calls for an ambulance. The witness Johnson testified that he had measured the distance from the bed in the bedroom to the refrigerator in the kitchen adjoining and found it to be 14 feet.

Joyce Coats, mother of Susan, testified that her daughter was right-handed and that she was in a good mood when she had last seen her on the day before her death. She said that Susan had plans to go to school and that she was in the process of fixing her home.

The pathologist who had performed the autopsy upon the body of Susan Coats, Dr. Alden Thompson, testified that his examination showed that she died as a result of a gunshot wound of the brain—and here we quote from the transcript of the testimony as it was recalled and agreed to by counsel—

> "* * * with the bullet entering the head through the upper *left* hand hard palate of the oral cavity. He testified that the entry was through the upper *left* and that the gun was fired from a very close distance, approximately one to two inches away from the subject. There was a path through the interior maxilla passing through the *right* interior hard palate, entering the cranial vault, penetrating the *right* cerebral hemisphere. In layman's terms, he identified the path of the bullet as being from the slight angle of *left to right*, entering the face at approximately the center of the upper *left* area and passing into the brain. He testified that the bullet passed

through the brain at the top of the skull, at or near the midline of the skull and ricocheted back into the brain, where it was recovered." (Emphasis added.)

■■ Although the pathologist's report appears not to have been admitted into evidence at trial, appellant has included a copy of it as part of the record on appeal, and we take judicial notice of the contents of that report as a public record (*People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753). In the report the pathologist lists as one of the "Final Pathologic Diagnoses,"

"1. Gunshot wound of mouth involving upper lip with bullet penetrating through *right* anterior maxilla, passing through *right* anterior hard palate, entering cranial vault, penetrating the *right* cerebral hemisphere." (Emphasis added.)

Under "Gross Description" the pathologist has written,

"Examination of the head reveals a large bullet wound of entrance in a position of the *right* upper lip. * * * The wound margins are then spread revealing marked deformity of the upper lip and the soft tissues with a wound of entrance passing into the hard palate just within about 2 Or [*sic*] 3 cm. of the lip margin fracturing the *right* maxilla and with fragments of teeth inside the oral cavity. Portions of fragmented bone are inside the oral cavity. These fragments are not removed. The path passes through the hard palate and passes superior and posterior and enters the cranial vault. * * *." (Emphasis added.)

In his description of the "Brain" the pathologist has written in part,

"On removal of the brain, there is a ricochet mark in the *right* posterior parietal occipital area near the midline where there is pulped brain substance in an area about 2.5 to 3 cm. in diameter. The brain is then removed revealing a somewhat deformed *right* cerebral hemisphere somewhat enlarged * * *." (Emphasis added.)

In a "Comment" in the report the pathologist stated, "This gunshot wound appears to a close contact wound * * *." At trial he testified that the young woman appeared to have been in good health with no evidence of any recent bruising or signs of a struggle.

In response to hypothetical questions, the pathologist testified that if one holds one's arms in a position whereby one is pointing a revolver at an area of one's own face, once a shot is fired, assuming some force is exerted on the arms, as by the recoil of a discharged revolver, the natural motion of the arms is an outward one. He testified that if an individual were lying on his back, held the weapon to his face and fired, his arms would flail outwards with the palms of his hands facing up. On cross-examination the

witness said that he saw no physical fact inconsistent with the possibility that the dead girl discharged the firearm herself; he said that since he was not present when the wound was inflicted, he could say only that the girl died of a gunshot wound but could not say what position she was in when she received the wound. The pathologist indicated that the laboratory reports of blood tests he had performed showed that there was cannabis in the bloodstream of the victim but did not indicate the presence of ethanol, a fact suggesting no indication that the girl had been drinking shortly before her death.

■■ In support of an issue defendant raises with respect to his motion to dismiss the indictment for insufficient evidence, he has included as part of the record on review a verbatim transcript of the questions asked and the answers given during the grand jury proceedings. Inexplicably omitted from the record of the testimony at trial, expressly agreed upon by counsel for both parties, are several facts highly damaging to defendant which appear in the testimony heard by the grand jury as well as in the verbatim transcript of the State's Attorney's closing argument with no objection by defendant. Occasionally the State's Attorney mentions one of these facts more than once in his argument before the jury. At no time during any part of closing argument does counsel for defendant object to the introduction of any of these facts. However, because they are not properly part of the record in that they do not appear in the transcript of the proceedings of the trial court as agreed upon by counsel, we do not consider them.

■■ It is well established that a reviewing court will not disturb a jury's verdict of guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt as to the guilt of the accused. (*People v. Burchette* (1972), 4 Ill. App. 3d 734, 281 N.E.2d 773.) Having carefully examined the record, we hold that the evidence was sufficient to support the jury's verdict. A jury is not compelled to accept a defendant's account of what happened but can consider the surrounding circumstances and the probability or improbability of the defendant's story. (*People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 1074, 99 S. Ct. 848.) The defendant in this cause has asked the trier of fact to believe that in the amount of time that it took him to walk less than 14 feet—he said that she was still lying on her back on the bed as late as when he stopped at the doorway of the kitchen and looked back, cautioning her with regard to handling the shells—that in that amount of time a girl with little or no knowledge of how to load the revolver in question rose from a reclining position, while wearing a heavy winter coat that was completely buttoned, in order to gather sufficient ammunition from wherever it was

kept to load all five chambers of the weapon and did, in fact, load all five chambers whereupon, either intentionally or unintentionally, she shot herself. In addition to defendant's incredible account of the incident, there are other facts that alone might have been merely improbable but together are indicative of defendant's guilt. Defendant stated that he had disturbed nothing. The gun was found 15½ inches to the left of the body slightly under a pillow bearing an indentation of the kind created by considerable weight. The defendant is right-handed, and the indentation in the pillow could, as the State argued at trial, have been made by the knee of a person astride the girl as she lay on the bed. While the gun might conceivably have landed where it did as a consequence of recoil depending on where she might have been when she pulled the trigger, the crime scene technician testified that the direction of the recoil is "back and up, away from the discharge." Since the girl was right-handed and was found lying flat on her back across the bed with her face straight up, it is not unreasonable to suppose that, had she inflicted the wound upon herself, the direction of recoil would have been back and away from her body and toward her right side rather than her left whether or not she inflicted the wound while lying down, sitting up or standing. The pathologist's testimony indicated that had the girl inflicted the wound herself, her hands could have been expected to be resting palms up and her arms could have been expected to be extended outward, away from her body. As the photograph which we have mentioned and the unconflicting testimony of numerous witnesses on this point show, her hands were resting palms down and her arms were close to her body and parallel with it.

With regard to the pathologist's testimony as recollected by counsel, we are obliged to accept the statement in the record as the testimony which the jury heard. We note that a point of entry on the left side of a right-handed victim's mouth or face is somewhat less consistent with a self-inflicted wound than is a point of entry on the right side of a right-handed victim's mouth or face. If the point of entry was indeed that which is stated in the pathologist's report, while it would not have been inconsistent with a self-inflicted wound, neither would it have been inconsistent with a wound inflicted by another person at close range, possibly someone astride the victim and facing her. During closing argument the State's Attorney argued to the jury,

> "If you recall the pathologist's testimony, the entry of the wound was right here, indicating between the lip and the nose. The bullet went into the right side of her head. We would submit that a right-handed person on top of another person would fire in that direction. That is the natural course. We would also submit that a right-handed person who fired it would then toss the gun this way.

If you will look at the picture that is the way the gun went, like that."

Whether the jury heard that the point of entry was to the right or to the left, a point of entry to the right could not explain away either the difficulties associated with the position of the victim's arms and the palms of her hands or the difficulties associated with time which defendant's account presents. Thus, even if the point of entry were on not the left but the right side of the mouth or face, the evidence would still be sufficient beyond a reasonable doubt to find defendant guilty of involuntary manslaughter.

■■ Defendant also contends on appeal that the trial court ought not to have permitted the State during its redirect examination of the crime scene technician to elicit testimony to the effect that the powder residue test on the victim's hands was inconclusive. On direct the witness testified that he had conducted such tests on the hands of both the victim and the defendant. On cross-examination the defendant established that the powder residue test was inconclusive as to himself. Since he opened the door to the matter of the results of the tests on cross-examination, he will not be heard to complain that the trial court ruled erroneously in permitting the State likewise to show the results of the tests, particularly where his defense is that the victim herself inflicted the wound.

■■ Defendant complains that the pathologist's testimony on redirect as to the contents of a report on the victim's blood analysis showing the absence of alcohol in the victim's bloodstream constituted prejudicial hearsay. On cross-examination of the pathologist defendant had ascertained that the analysis of the victim's blood indicated the presence of cannabis. Defendant argues that the answer to his own question was properly in evidence because of the State's failure to object to the introduction of hearsay. He maintains that the trial court was in error when it found that he had by his own question on cross-examination with respect to cannabis opened the door to questioning on redirect with respect to alcohol. While we do not decide whether the ruling was error, we conclude that in view of the considerable evidence of defendant's guilt, that such error could not have been anything but harmless.

■■ Defendant maintains also that a leading question asked by the State of one of the telephone operators was prejudicial. The State's Attorney had asked the witness whether the person requesting an ambulance had said that the victim had shot herself. The trial court sustained defendant's objection because it considered the question "leading and somewhat suggestive," and the State's Attorney said that he would withdraw the question. Any error was therefore promptly cured.

■■ Defendant contends that the hypothetical question asked of the pathologist was not based upon facts in evidence. The precise question or

questions to which defendant objects are insufficiently specified in the record to enable us to consider the issue, and we therefore decline to do so.

Defendant raises additional contentions of error which we have considered and have found to be without merit.

Affirmed.

SPOMER and KARNS, JJ., concur.