No. 2--03--1228 _______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________
___________
    

FIRST NATIONAL BANK OF La GRANGE, ) Appeal from the Circuit Court

Guardian of the Estate of Benjamin Chase, a   ) of Du Page County.

Minor, )

)

Plaintiff-Appellee and Cross-Appellant, )              

)

v. ) No. 99--L--92

)

GLEN OAKS HOSPITAL AND MEDICAL ) 

CENTER, )

) 

Defendant-Appellant )

)

(Rae Armbrust, Special Administrator of   ) Honorable

the Estate of David W. Brewer, Deceased, ) Hollis L. Webster,

Defendant and Cross-Appellee). ) Judge, Presiding.

________________________________________________________
________________________ 

JUSTICE KAPALA delivered the opinion of the court:

            Defendant Glen Oaks Hospital and Medical Center (Glen Oaks) appeals from the denial of its motion for a new trial after a jury verdict in the circuit court of Du Page County finding that Glen Oaks was negligent with respect to the delivery of Benjamin Chase.  Plaintiff, First National Bank of La Grange, guardian of the estate of Benjamin Chase, cross-appeals from the verdict in favor of the estate of defendant Dr. David W. Brewer. 

I.  BACKGROUND

We begin by reciting the facts of Benjamin's delivery.  We discuss the trial testimony, as necessary, within our resolution of each contention of error.  Dr. Brewer was the obstetrician in charge of the delivery and the care of Benjamin's mother.  After consultation with Dr. Brewer, Benjamin's parents chose to use the Bradley method of natural childbirth.  The Bradley method advocates the avoidance of medical intervention during labor and delivery.  The Bradley method recommends several natural techniques to augment labor, including effleurage (stroking the abdomen), showering to relieve pain and relax, and nipple stimulation to induce uterine contractions.  The method also teaches that patients and healthcare providers are equal partners in the birth plan.  Consequently, Bradley patients often prefer joint decision-making before any deviations from the natural childbirth process are taken.  

Benjamin's mother's membranes ruptured at approximately 1 a.m. on June 18, 1991.  She contacted Dr. Brewer and he told her to contact him again as soon as contractions started.  Benjamin's mother contacted Dr. Brewer at 4 a.m. when contractions began.  Dr. Brewer told her to go to Glen Oaks when the contractions were arriving in five-minute intervals.  Benjamin's parents arrived at Glen Oaks later that morning.  Dr. Brewer met Benjamin's parents at the hospital and examined Benjamin's mother at approximately 7 a.m.  

A fetal monitor was attached, and Dr. Brewer ordered that Benjamin's mother be observed for labor and that the use of Pitocin, a drug used to induce uterine contractions, would be discussed if labor did not progress by the next day.  Continuous fetal monitoring was not ordered.  Benjamin's mother was allowed to ambulate and use the bathroom, as long as she informed the nurses before she got out of bed.  At 2:08 p.m. on June 18, Dr. Brewer performed a sterile vaginal exam on Benjamin's mother.  He informed her that if labor was not progressing by the next morning, they would need to take steps to move her along.  A decision was made that labor would be naturally augmented through nipple stimulation instead of the use of Pitocin.

Dr. Brewer again examined Benjamin's mother at 7:35 a.m. on June 19.  Because labor had progressed only minimally, Dr. Brewer ordered walking and nipple stimulation.  Nipple stimulation occurred and contractions commenced, but the nipple stimulation ceased after 26 minutes due to two contractions occurring very close in time to one another, otherwise known as a coupled contraction, and the fetal monitor showing Benjamin's fetal heart rate dropping below baseline late in the contraction phase, otherwise known as a late deceleration.  Baseline refers to the average fetal heart rate over a 10-minute period.  Benjamin's mother was unable to reach active labor.  She was allowed to use the bathroom and ambulate.  At 11:44 a.m., a sterile vaginal exam was performed.  Nipple stimulation resumed and the contraction interval improved.  Benjamin's mother once again used the bathroom and, subsequently, another vaginal exam was performed.  Her labor progressed during that afternoon.

At 3 p.m., one hour after her last vaginal exam, Benjamin's mother informed her nurse that she needed to go to the bathroom.  The evidence conflicted as to whether the nurse asked Benjamin's mother whether she needed to urinate or move her bowels, because imminent delivery may feel similar to the urge to defecate.  At 3:05 p.m., the fetal monitor was removed and the nurse assisted Benjamin's mother to the bathroom.  The nurse's shift was ending so she left Benjamin's parents in the bathroom at 3:15 p.m. and went to the nurses' station.  Benjamin's parents were in the bathroom from 3:15 p.m. to 3:35 p.m.  During this time, a nurse came in and reassured Benjamin's mother.  At 3:35 p.m., another nurse arrived and insisted that Benjamin's mother return to bed immediately.  

The fetal monitor was reattached at 3:41 p.m.  The nurse paged Dr. Brewer and summoned another nurse.  Between 3:43 p.m. and 4:03 p.m., the nurses took steps to alleviate what they believed to be compression of Benjamin's umbilical cord and to oxygenate him.  Dr. Brewer arrived at 4:06 p.m.  He performed a vaginal exam and determined that Benjamin's mother's dilation was complete.  He then administered medication to stop the contractions.  Benjamin presented with his hand next to his face and his umbilical cord slightly pressed against his left shoulder.  Dr. Brewer performed an episiotomy and delivered Benjamin using forceps at 4:33 p.m.  

Because of the compression of the umbilical cord, Benjamin suffered "hypoxicischemic encephalopathy," which is a brain tissue injury caused by insufficient blood and oxygen supply.  Benjamin has problems with range of motion and movement.  He has great difficulty speaking and swallowing and has significantly impaired fine motor skills.  His cognitive functioning is intact.  

Plaintiff brought suit against Glen Oaks and Dr. Brewer for malpractice.  The jury found Glen Oaks liable but found Dr. Brewer not liable.  Glen Oaks filed a timely appeal.  Plaintiff filed a timely cross-appeal from the judgment in favor of Dr. Brewer.            

II.  DISCUSSION  

Glen Oaks contends that plaintiff's counsel engaged in a pattern of misconduct during trial such that a new trial is warranted.  Plaintiff denies any attorney misconduct or prejudicial effect.  Furthermore, plaintiff has cross-appealed, asking that we grant a new trial with respect to Dr. Brewer because of various errors made by the trial court.  If we decide not to grant Glen Oaks a new trial, plaintiff requests that we not consider its cross-appeal.

Glen Oaks' claims of misconduct are extensive.  Glen Oaks moved for a mistrial several times during the course of the trial.  Glen Oaks categorizes plaintiff's counsel's misconduct into three categories.  First, Glen Oaks avers that plaintiff's counsel engaged in "television-style" theatrics by engaging in conduct akin to "incomplete impeachment," whereby plaintiff's attorney would ask a  leading question about undisclosed opinions and then withdraw the question as soon as a Rule 213 (177 Ill. 2d R. 213) objection was made.  Second, Glen Oaks alleges that plaintiff's counsel violated an 
in
 
limine
 order that prohibited any suggestion that medical records had been forged or altered.  Finally, Glen Oaks contends that plaintiff's attorney engaged in misconduct calculated to arouse and inflame the jury's passion and prejudice, including extensive use of improper tone, witness abuse, flagrant disagreement with the trial court's rulings in the jury's presence, argumentative questions, emotional outbursts, and theatrics calculated to demean witnesses or to arouse the jury's sympathy.

"Although improper argument and attorney misconduct can be the basis for granting a new trial, that determination is left to the sound discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion.  [Citation].  The attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record, and the trial court is in a superior position to assess and determine the effect of improper conduct on the part of counsel. [Citation]."  
Zuder v. Gibson
, 288 Ill. App. 3d 329, 338 (1997).  Generally, a reviewing court will not find reversible error due to improper comments by counsel unless a party has been substantially prejudiced by such comments.  
Bresland v. Ideal Roller & Graphics Co.
, 150 Ill. App. 3d 445, 454 (1986).  "Furthermore, if the trial was fair as a whole and the evidence was sufficient to support the jury's verdict, a case will not be reversed upon review."  
Bresland
, 150 Ill. App. 3d at 454.  However, juries should not be unfairly biased by appeals to their emotions.  
Chakos v. Illinois State Toll Highway Authority
, 169 Ill. App. 3d 1018, 1029 (1988).  

A.  Questions Posed in Violation of Supreme Court Rule 213

First, we turn to plaintiff's counsel's questioning of Linda Mahlmeister, plaintiff's nursing expert.  Mahlmeister testified as to what were, in her opinion, several breaches of the nursing standard of care.  Glen Oaks claims that during her questioning, plaintiff's counsel intentionally framed questions to suggest to the jury matters for which there was no basis in the evidence, in violation of Supreme Court Rule 213 (177 Ill. 2d R. 213).  Glen Oaks cites six separate instances of plaintiff's counsel posing a question to Mahlmeister, receiving an objection to the question, and then withdrawing the question.  The exchanges occurred as follows:

"[Plaintiff's counsel]:  What information should Nurse Rogers have given to this mother at that time?

[Mahlmeister]:  That once she emptied her bowels or bladder--

[Defense counsel]:  Objection.

[Mahlmeister]:  (Continuing.) --she should--

THE COURT:  Basis?

[Defense counsel]:  213.

THE COURT:  Okay.  Please step up.

[Discussion at the bench and outside of the record]

THE COURT:  Question withdrawn.

* * *

[Plaintiff's counsel]:  Was it a deviation of [
sic
] standard of care for Bertha DeSas not to hit the button?

[Defense counsel]:  Objection.

THE COURT:  Basis?

[Defense counsel]:  213.

[Plaintiff's counsel]:  I'll withdraw the question.

THE COURT:  Question withdrawn.

* * *

[Plaintiff's counsel]:  Was there any documentation or assessment of the patient's condition between 1500 and 1535 by any nurse?

[Mahlmeister]:  No.

[Plaintiff's counsel]:  Is that a deviation from the standard of care?

[Defense counsel]:  Objection.

THE COURT:  Basis?

[Defense counsel]:  213.

THE COURT:  Show me the document.

[Plaintiff's counsel]:  I will withdraw the question, Judge, if this is going to be the

objection.

THE COURT:  Okay.  Question withdrawn.  Please continue.

* * *

[Plaintiff's counsel]:  Could she do that without a doctor's order?

[Mahlmeister]:  Yes.

[Plaintiff's counsel]:  Why?

[Defense counsel]:  Objection.

THE COURT:  Basis?

[Defense counsel]:  213.

THE COURT:  Any response?

[Plaintiff's counsel]:  I respond by withdrawing the question at 4:15 in the afternoon.  Thank you, your Honor.

THE COURT:  Okay.  Question withdrawn.  Please proceed.

* * *

[Plaintiff's counsel]:  Were there any tetanic contractions observed by you in this chart?

[Mahlmeister]:  Yes.

[Plaintiff's counsel]:  Where?

[Mahlmeister]:  Again, on Panel 73528 through 29.

[Defense counsel]:  Objection.

THE COURT:  Basis?

[Defense counsel]:  213.

THE COURT:  Any response?

[Plaintiff's counsel]:  I can't--she seems--yeah, I have a response, but I can't give it at this point, and the 213s are in front of the Court.

THE COURT:  Do you have--

[Plaintiff's counsel]:  I will withdraw the question.

THE COURT:  Okay.  Question withdrawn.  Please proceed.

*  *  *

[Plaintiff's counsel]:  Do you have an opinion, as a nurse, whether or not this augmentation of labor would have turned out the same way with Pitocin or with--

[Defense counsel]:  Objection.

[Plaintiff's counsel]:  --nipple stimulation?

[Another objection.]

THE COURT:  Basis?

[Defense counsel]:  213.  

[Defense counsel]:  213 and our motion--our preliminary--.

[Plaintiff's counsel]:  I'll withdraw the question.

THE COURT:  All right.  Question withdrawn.

[Plaintiff's counsel]:  All right."

Glen Oaks relies on 
Green v. Cook County Hospital
, 156 Ill. App. 3d 826 (1987), 
Lee v. Calfa,
 174 Ill. App. 3d 101 (1988), and 
Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co.
, 306 Ill. App. 3d 115 (1999).  In 
Green
, which concerned an action for medical malpractice, the court found that defense counsel's incomplete impeachment of the plaintiff's principal medical witness amounted to prejudicial error.  
Green
, 156 Ill. App. 3d at 832-33.  Before cross-examination began, defense counsel stated in a sidebar conference that he would ask the witness whether he would be surprised if the plaintiff could perform certain activities.  
Green
, 156 Ill. App. 3d at 833.  Defense counsel also promised to " 'connect it up later.' "  
Green
, 156 Ill. App. 3d at 833.  
On cross-examination, defense counsel posed questions such as:

 " 'Can [the plaintiff], would it surprise you if [the plaintiff] by himself would get out of a wheelchair and walk the distance between where you are sitting and I am standing, and then sit down in another kind of chair? *** and do it in a normal fashion?' "  
Green
, 156 Ill. App. 3d at 833. 

The witness indicated that he would be surprised if the plaintiff could perform any of  the activities posed by defense counsel.  
Green
, 156 Ill. App. 3d at 833.  There was no subsequent evidence tendered that showed that the plaintiff could in fact perform any of the tasks presented to the witness.  
Green
, 156 Ill. App. 3d at 833.  The plaintiff moved for a mistrial and for sanctions for the incomplete impeachment.  
Green
, 156 Ill. App. 3d at 833.  The trial court denied both motions.  
Green
, 156 Ill. App. 3d at 833.  On appeal, the court found that innuendo through incomplete impeachment is highly prejudicial.  
Green
, 156 Ill. App. 3d at 833.  Further, the court found that defense counsel's questions were intended to lead the jury to believe that the plaintiff could in fact perform the tasks and that such remarks were improper without evidentiary support.  
Green
, 156 Ill. App. 3d at 834.  

In 
Lee
, defense counsel suggested during his cross-examination of the plaintiff that the plaintiff's testimony was impeached by prior inconsistent statements.  
Lee
, 174 Ill. App. 3d  at 112.  Either this incomplete impeachment was abandoned or objections were sustained in relation to the questioning.  
Lee
, 174 Ill. App. 3d  at 112.  This court stated, citing 
Green
, that incomplete impeachment was highly prejudicial.  
Lee
, 174 Ill. App. 3d  at 112.  We further found that since the outcome of the case was largely dependent on whether the jury found the plaintiff or the defendant credible, and the incomplete impeachment was intended to lead the jury to doubt the plaintiff's credibility, defense counsel's questioning was improper.  
Lee
, 174 Ill. App. 3d at 112.  However, we also found that, taken individually, the incomplete impeachment and the other errors made in the case did not require reversal, but when taken together, reversal was required.  
Lee
, 174 Ill. App. 3d  at 112.

Finally, in 
Los Amigos
, on the last day of trial, counsel for the third-party plaintiff unexpectedly changed her theory of the case and suggested that a lease had been signed and then subsequently altered by the third-party defendant.  
Los Amigos
, 306 Ill. App. 3d at 128.  The trial court allowed counsel to publish the lease to the jury, over objection.  
Los Amigos
, 306 Ill. App. 3d at 128.  There was no evidence presented to show that such an alteration had in fact occurred.  
Los Amigos
, 306 Ill. App. 3d at 128.  The appellate court cited 
Green
 and stated that unsupported innuendo created by counsel required reversal.  
Los Amigos
, 306 Ill. App. 3d at 128.  The court also found that the error had been compounded by counsel's references during closing argument to the alteration of the lease.  
Los Amigos
, 306 Ill. App. 3d at 129.

Assuming 
arguendo
 that the questions asked by plaintiff's counsel in this case were not included in the Rule 213 disclosures, we find that the questions do not amount to prejudicial error.  First, the questions asked in both 
Green
 and 
Lee
 constituted incomplete impeachment.  These questions involved attempts by counsel to attack the credibility of witnesses.  We believe that such an attack has the potential for prejudicial effect far beyond the questions asked.  More specifically, we believe that a successful impeachment attempt may lead a jury to question not only the testimony impeached, but other aspects of a witness's testimony, because the witness has already been shown to be not credible in at least one instance.  The questioning in 
Los Amigos
 also attempted to show that the witness was untruthful by suggesting that he was somehow involved in the alteration of documents.  In the case before us, plaintiff's counsel was questioning his own witness and did not in any way suggest that the witness was not credible and, thus, the potential prejudicial impact of such questioning is far different from that in the cases cited by Glen Oaks.  Moreover, we note that Glen Oaks does not contend that plaintiff's counsel repeated the error at closing argument like the counsel in 
Los Amigos
 or that plaintiff's counsel did not follow through on a promise to the court like the counsel in 
Green
.  Additionally, as we stated in 
Lee
, an error of this type does not require reversal when considered individually.  

Second, we believe that any suggestion created by plaintiff's counsel that Glen Oaks breached the standard of care would have minimal prejudicial impact because there were several other proper questions regarding Glen Oaks' breach of the standard of care.  The jury need have found only one breach of the standard of care to reach its verdict, and it is extremely unlikely that the jury disbelieved plaintiff's expert's testimony as to the other breaches of the standard of care but instead seized upon only plaintiff's counsel's improper questions.  Third, we believe that any prejudice caused by the improper questions was cured by the prompt withdrawal of the questions.  
People v. Brown
, 27 Ill. App. 3d 569, 578 (1975); see also 
People v. Johnson
, 218 Ill. App. 3d 967, 993 (1991); 
People v. Camden
, 91 Ill. App. 3d 946, 957 (1980).   

B.  Alleged Violations of the 
In
 
Limine
 Order Barring Plaintiff's Counsel From Suggesting That Defendants Changed, Altered, Destroyed, or Otherwise Modified Medical Records 

Glen Oaks next contends that plaintiff's counsel violated the trial court's 
in
 
limine
 order barring plaintiff's counsel from suggesting that any of the medical records had been changed, altered,  destroyed, or otherwise modified.  Glen Oaks claims that the first violation of this order occurred when plaintiff's counsel questioned Dr. Linda Holt.  This questioning of Dr. Holt initially involved whether Dr. Brewer would have been aware that he would be accused of breaching medical standards of care.  An objection was made by counsel for Dr. Brewer's estate and joined by Glen Oaks' counsel.  The objection was sustained.  Plaintiff's counsel then asked whether obstetricians generally have access to charts after "something like this happens."  Counsel for Dr. Brewer's estate objected and a sidebar conference followed.  After the sidebar, plaintiff's counsel continued questioning but did not reassert the question.  Plaintiff's counsel also inquired as to whether the labor and delivery admission note form used was a standard form document.  Glen Oaks made an objection, which was sustained.  Dr. Holt was then asked about the timing of certain entries.  There was an objection by counsel for Dr. Brewer's estate as to repetitiveness, which was overruled.  Plaintiff's counsel also asked Dr. Holt if she knew why one page was not stamped with the unit nurse's/secretary's plate.  An objection to this question by counsel for Dr. Brewer's estate was overruled.  

Initially, we note that as to the questions that were objected to only by counsel for Dr. Brewer's estate, Glen Oaks has waived any contention of error.  See 
Brown v. Timpte Inc.
, 137 Ill. App. 3d 1053, 1063, 1064 (1985) (holding that, although there were four defendants in the case who objected at various times to the alleged errors later raised by the plaintiff on appeal, the waiver rule was applicable because the "plaintiff's failure to object, join in or adopt an objection by one of the defendants' attorneys cannot be said to inure to her benefit").  Next, we find that, at most, the questions asked of Dr. Holt only indirectly insinuated impropriety regarding the medical records and that, therefore, any prejudicial effect was minimal.  Moreover, as to the questions to which objections were sustained, we find that any prejudicial impact was cured.  
Branum v. Slezak Construction Co.
, 289 Ill. App. 3d 948, 959 (1997) (holding that sustaining an objection generally cures any prejudicial impact).  As to the questions to which objections were overruled, Glen Oaks makes the general  argument that the questions violated the 
in
 
limine
 order, but it does not adequately develop an argument why this is so.  Additionally, with regard to the objection that was made on the basis 
of repetitiveness, we
 find that the objection was insufficient to preserve for review the issue of violation of the 
in
 
limine
 order, because an objection must be specific to preserve an issue for review.  
Gausselin v. Commonwealth Edison Co.
, 260 Ill. App. 3d 1068, 1079 (1994) (holding that "when an objection is made, specific grounds must be stated and other grounds not stated are waived on review").

Second, Glen Oaks points to the questioning of Dr. Dale Liaugminas in which plaintiff's counsel asked about the numbering of the forms and a doctor's ability to obtain additional blank forms from the unit secretary.  Glen Oaks did not object to these questions.  Consequently, it has waived any contention on appeal that the questions were error.  
Wodziak v. Kash
, 278 Ill. App. 3d 901, 914 (1996) (stating that to properly preserve an issue for appeal, a party must make a contemporaneous objection in the trial court). 

Third, Glen Oaks points to plaintiff's counsel's examination of Dr. William Petrando.  Glen Oaks contends that plaintiff's counsel asked leading questions that suggested forgery in a June 19 note regarding Benjamin's delivery.  This questioning culminated with the following question: 

"[Plaintiff's counsel]:  What if I told you I had two sets of records in this case and there were pages missing from one and some of them were mixed up--

[Objections by defense counsel.]"

The trial court sustained the objections and admonished plaintiff's counsel outside the presence of the jury.  During this admonishment, the court stated, "the question was extremely improper, laid an inference that there is something wrong with the medical records, two sets of medical records."  

While we agree that the question posed to Dr. Petrando was in violation of the trial court's 
in
 
limine
 order, the trial court issued a curative instruction after sustaining the objection to the question.  The court informed the jury:

"Ladies and gentlemen, at this time I will instruct you to disregard the last question posed by [plaintiff's counsel] regarding two sets of hospital records.

No inference should be drawn by you that there is anything improper regarding the record in this case.  There is no evidence of any record alteration in this case, and no such inference should be drawn."

Generally, sustaining an objection and giving an instruction to the jury to disregard cures any prejudicial impact of an error.  
Clayton v. County of Cook
, 346 Ill. App. 3d 367, 383 (2003).  This instruction cured any infirmity as to the question posed to Dr. Petrando.  Moreover, the question to Dr. Petrando is the last instance in which Glen Oaks claims that plaintiff's counsel violated the 
in
 
limine
 order.  Although the instruction first concerned solely the question asked of Dr. Petrando, the latter part of the instruction made clear that the jury should not infer that any medical record alteration occurred.  In our opinion, this statement also cured any previous prejudice caused by any earlier violations of the 
in
 
limine
 order.  

Glen Oaks, citing 
People v. Weinstein
, 35 Ill. 2d 467, 471 (1966), contends that plaintiff's counsel's persisting in improper conduct eliminated the salutary effect of the trial court's curative instruction.  In 
Weinstein
, the State continued its improper argument to the jury immediately after the trial court sustained an objection to the line of argument.  
Weinstein
, 35 Ill. 2d at 469.  However, as we have stated, the curative instruction in this case came after the last alleged violation of the 
in
 
limine
 order, and, thus, 
plaintiff's counsel did not persist in violating the 
in
 
limine
 order after the curative instruction.  Therefore, unlike in 
Weinstein
, there was no conduct by plaintiff's counsel that vitiated the salutary effect of the curative instruction.  Further, there is no indication that the trial court in 
Weinstein
 issued a curative instruction, only that the trial court sustained the defense counsel's objections.  While sustaining an objection also generally cures any prejudicial impact (
Branum
, 289 Ill. App. 3d at 959), we find that a curative instruction enhances the curative effect.  Therefore, we adhere to the general rule that the curative instruction cured any prejudice caused by the error.  

C.  Misconduct Calculated to Arouse and Inflame the Jury's Passion and Prejudice

As its last contention of error, Glen Oaks contends that plaintiff's counsel engaged in a pattern of misconduct, which Glen Oaks categorizes as improper tone, witness abuse, flagrant disagreement with the trial court's rulings in the jury's presence, argumentative questions, emotional outbursts, theatrics calculated to demean witnesses or to arouse the jury's sympathy, and blatant incivility.  

Initially, Glen Oaks contends that plaintiff's counsel violated an 
in
 
limine
 order barring any reference to Nurse Bertha Desas as a "nurse anesthesiologist."  Glen Oaks contends that this violation was prejudicial because it suggested to the jury that Nurse Desas be held to a higher standard of care than a regular nurse.  However, there was an objection to the comment containing the "nurse anesthesiologist" reference and the objection was sustained.  The trial court stated, "Sustained.  The jury will disregard the last comment."  Consequently, we find that any prejudicial impact of this violation was cured.  
Clayton
, 346 Ill. App. 3d at 383.      

Next, Glen Oaks contends that plaintiff's counsel, after a sidebar conference, stated, "We are not going to get done here.  I have a crippled kid coming in here at 2:00 p.m.  I don't want to delay this."  Glen Oaks contends that this statement suggested that Glen Oaks' counsel was somehow improperly impeding the proceedings.  However, Glen Oaks fails to point out that the statement occurred in the trial judge's chambers and outside the presence of the jury.  Therefore, there was no prejudicial impact upon the jury from this statement.  

Glen Oaks then points to the bases for its motions for mistrial.  The first motion was based  on an alleged conversation between plaintiff's counsel and Benjamin during Glen Oaks's cross-examination of Benjamin's father.  Glen Oaks claims that plaintiff's counsel talked and joked with Benjamin and that this distracted the jury and created an emotional connection between the jury and Benjamin.  The trial court stated that, although it may have missed something, it witnessed only one instance where plaintiff's counsel turned around.  The court also stated that it was in a good location to see any conduct and to see the jurors.  The court then denied the motion for mistrial.  Except for the allegations of defense counsel and the statement by the trial court, the record does not reflect any of the conduct alleged.  We do not find that Glen Oaks has demonstrated that any improper contact in fact occurred.  However, even if such contact did occur, there is no evidence that the jury witnessed it.  Thus, we cannot evaluate whether the conduct had a prejudicial effect on the jury.  The appellant has the burden of producing a sufficient record on appeal to support a claim of error.  
Foutch v. O'Bryant
, 99 Ill. 2d 389, 391-92 (1984).  In the absence of a sufficient record, we will presume that the judgment of the trial court conforms to the law and that there are sufficient facts to support the judgment.  
Foutch
, 99 Ill. 2d at 392.  

In its second motion for mistrial, Glen Oaks claimed that plaintiff's counsel engaged in a blistering, argumentative, sarcastic, and highly inflammatory exchange with his own witness, Benjamin's father, on redirect examination.  However, of the questions noted by Glen Oaks, all but one either did not draw an objection or induced an objection that was sustained.  Consequently, these contentions of error are waived and cured, respectively.  The one remaining question was, "You and your wife were blame--were you blaming yourself at that time?"  An objection was made, but the objection was overruled.  Benjamin's father responded, "We were feeling, you know, just a loss really.  You know, I mean, it was a very traumatic thing.  We were questioning ourselves, yes."  Glen Oaks does not explain whether it is contending that this question was blistering, argumentative, sarcastic, highly inflammatory, or some combination thereof.  We will not engage in speculation to determine which of Glen Oaks' theories of impropriety applies to this question.  Consequently, we find that Glen Oaks has failed to demonstrate that prejudicial error occurred in plaintiff's counsel's redirect examination of Benjamin's father.

In its third motion for mistrial, Glen Oaks complained of argumentative questioning and histrionics during the redirect examination of Dr. Robert Eilers.  More specifically, Glen Oaks complained of questioning regarding Benjamin's father's salary as a machinist, his loss of pay from taking off work to take Benjamin to see Dr. Eilers, and his inability to afford Dr. Eilers' fees.  Glen Oaks admits that objections to this line of questioning were sustained, but contends, citing 
Lorenz v. Siano
, 248 Ill. App. 3d 946 (1993), that the mere asking of the questions achieved an inflammatory result.  
Lorenz
 involved a vehicular accident in which the defendant, Siano, was the driver of an Illinois Department of Transportation vehicle.  
Lorenz
, 248 Ill. App. 3d at 948-49.  Defense counsel asked Siano about the ownership of his home and about his annual income.  
Lorenz
, 248 Ill. App. 3d at 953.  The appellate court found that the fact that the objections to the questions were sustained was of small consequence.  
Lorenz
, 248 Ill. App. 3d at 953.  However, the court also noted that the inflammatory effect was exacerbated by defense counsel's reminders that Siano, not the State, was the defendant in the case.  
Lorenz
, 248 Ill. App. 3d at 953.  Glen Oaks makes no contention that plaintiff's counsel made any subsequent attempt to remind the jury of Benjamin's father's financial situation.  Therefore, unlike in 
Lorenz
, plaintiff's counsel did not exacerbate the error.  Thus, we find that under the facts of this case, any prejudicial impact of the questions was cured when the objections were sustained.  Glen Oaks also complains of argumentative questioning of witness Susan Smith.  However, objections to these questions were sustained.  Glen Oaks makes no claim that the objections were noncurative. 

In its fourth motion for mistrial, Glen Oaks claimed that plaintiff's counsel repeatedly asked his associate if he was "getting down" the trial court's rulings, thereby suggesting that something was improper about the rulings.  However, Glen Oaks' citation to the record reflects only defense counsel's statement that plaintiff's counsel made such comments.  Glen Oaks does not point to any place in the record where plaintiff's counsel actually made such statements or Glen Oaks contemporaneously attempted to make such statements a matter of record.  Thus, Glen Oaks has not demonstrated that such error occurred.  Glen Oaks refers to plaintiff's counsel's misconduct during 
voir
 
dire
 of Dr. Liaugminas but also admits that the record does not indicate whether the jury witnessed the misconduct.  Therefore, we find that no prejudicial error has been shown in this regard.  Glen Oaks also contends that the repeated objections made and sustained during plaintiff's counsel's examination of Dr. Liaugminas were prejudicial.  We disagree.  In fact, the repeated sustainment of the objections likely was prejudicial to plaintiff, as it highlighted the fact that plaintiff's counsel was acting improperly and that, therefore, the jury should disregard such questioning.  Glen Oaks also claims that prejudicial error occurred during plaintiff's counsel's cross-examination of Sharon Driessen, when she was asked why she needed a lawyer to prepare for her deposition if she was not a defendant, whether she was amused by what she saw in Benjamin's mother's room when she arrived, and how Dr. Brewer could remain so calm.  Once again citing 
Weinstein
, Glen Oaks claims that prejudice occurred even though objections to the questions were sustained
.  Once again we disagree, because the objected-to questions in this case involved discrete issues, unlike the comments in 
Weinstein
, where counsel kept exacerbating the same error.  Thus, we believe that sustaining the objections corrected any prejudicial impact of each discrete error. 

In its fifth motion for mistrial, Glen Oaks contended that plaintiff's counsel's cross-examination of Henry Brennan, Glen Oaks' life-care planning expert, was argumentative, outside the scope of direct examination, and sarcastic.  However, Glen Oaks admits that its objections were sustained and makes no contention that the curative measures were ineffective.  Glen Oaks also contends that plaintiff's counsel seized an exhibit from Brennan and began waving it in front of the jury and that this action suggested to the jury that some impropriety occurred.  While the trial court acknowledged that plaintiff's counsel was waving exhibits in front of the jury, it also denied the motion for mistrial.  We fail to see how simply waving an exhibit can be deemed prejudicial error.  In fact, Glen Oaks makes no explanation of what impropriety would be suggested to the jury by such action.  We find no prejudicial error in this regard.     

  In its sixth motion for mistrial, Glen Oaks complained of plaintiff's counsel's cross- examination of Dr. Petrando, in which Glen Oaks claims argumentative questions and questions regarding the alteration of medical records were asked.  As we have already determined above, any prejudicial impact of error with respect to the questions involving the medical records was cured.  As far as argumentative questioning, the page in the record cited by Glen Oaks demonstrates that an objection as to argumentativeness was sustained, and, thus, we find that the error was cured.  Glen Oaks also contends that during the cross-examination of its fetal monitor expert, plaintiff's counsel held in front of the witness books about which he asked no questions and then loudly dropped on the table or floor.  Although such conduct is not appropriate, Glen Oaks does not explain how this conduct was prejudicial.  In fact, such conduct could have prejudiced plaintiff, because the jury may very well have thought that plaintiff's counsel was engaging in unnecessary theatrics.  Finally, Glen Oaks contends that during his cross-examination of Glen Oaks' nursing expert, plaintiff's counsel asked argumentative questions.  However, Glen Oaks once again admits that its objections were sustained and makes no contention that the curative effect was inadequate.  

D.  Cumulative Prejudicial Error and Whether the Case Against Glen Oaks Was Close

Glen Oaks contends that if each error does not warrant reversal individually, they warrant reversal cumulatively.  Glen Oaks also contends that, because the case against it was close, any improper conduct by plaintiff's counsel was prejudicial and, therefore, a new trial is warranted.  We disagree.  The mere fact that multiple errors are present does not in and of itself result in prejudicial error.  In 
Lee
 we found that "[w]hile any one of the complaints set forth *** would not alone require reversal, when taken together *** the complaints establish a pattern of conduct intended to thwart the orderly administration of justice."  
Lee
, 174 Ill. App. 3d at 112.  We also stated that "[j]ury verdicts are not lightly set aside, but where a case is close on its facts *** and the jury might have decided either way, errors made at trial which might have had a significant effect on the outcome of the case require a reversal.  [Citation.]"  
Lee
, 174 Ill. App. 3d at 113.  We simply do not find that Glen Oaks has shown a pattern of conduct intended to thwart the orderly administration of justice or errors that may have had a significant impact in this case.  Almost all of the errors cited did not draw an objection or were cured.  We take note of the following statement made by the trial court during the hearing on the motion for a new trial:

"In my judgment in this particular case there was palpable animosity between Hospital counsel and plaintiff's counsel, and that is unfortunate.  I saw demonstrated both in front of the jury and in front of the Court a lack of--mutual lack of respect and inappropriate conduct, and I think that is to be shared between counsel.

However, I will tell you this is one of those cases that I believe that the jury disregarded the histrionics, disregarded the facial expressions, the sighs, the outbursts.  Clearly, [plaintiff's counsel] had numerous outbursts and, [defense counsel], you have catalogued them quite well in your brief.

But in my judgment the verdict in this case represents the thoughtful and conscientious effort of a hard-working jury over a very lengthy period of time."  

Accordingly, we find that the trial court did not abuse its discretion in denying Glen Oaks' motion for a new trial.  

We find it important to note that our decision in no way condones the actions of plaintiff's counsel.  Some of Glen Oaks' contentions of misconduct are misplaced; however, many of its contentions point to valid sources of error.  Although we have found the errors presented either to have been nonprejudicial or to have been cured, or the contentions to have been waived, this decision should not be construed as an endorsement of such behavior.  In emotionally charged cases such as this case, counsel should take heed not to inject error of the type noted here, because to do so invites reversible error.

E.  Plaintiff's Cross-Appeal

Plaintiff requested that we not consider its cross-appeal unless we grant Glen Oaks a new trial.  Because we have determined that Glen Oaks is not entitled  to a new trial, we will not consider plaintiff's cross-appeal. 

III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County denying Glen Oaks' motion for a new trial.

Affirmed.

GILLERAN JOHNSON, J., concurs.

JUSTICE GROMETER, dissenting:

As the majority notes, in 
Lee v. Calfa
, 174 Ill. App. 3d 101, 113 (1988), this court stated that "[j]ury verdicts are not lightly set aside, but where a case is close on its facts *** and the jury might have decided either way, errors made at trial which might have had a significant effect on the outcome of the case require reversal."  Slip op. at 21.  The trial court here acknowledged that the case was close on its facts when it ruled on Glen Oaks' motion for a directed verdict.  In 
Lee
, we also stated that "[w]hile any one of the complaints set forth *** would not alone require reversal, when taken together *** the complaints establish a pattern of conduct intended to thwart the orderly administration of justice."  
Lee
, 174 Ill. App. 3d at 112.  I am mindful that some of Glen Oaks' allegations of improper conduct by plaintiff's counsel, Attorney Geraci, have been waived.  Yet, as the majority concedes, "many of [Glen Oaks'] contentions point to valid sources of error."  Slip op. at 21.  Even so, the majority ultimately concludes that, when considered cumulatively, Glen Oaks' complaints of Attorney Geraci's conduct at trial did not constitute reversible error.  Slip op. at 20-21.  I respectfully dissent because, unlike the majority, I find that Attorney Geraci engaged in a pattern of conduct intended to thwart the orderly administration of justice.

The record is replete with examples of Attorney Geraci's misconduct.  With regard to the questioning of Mahlmeister, plaintiff's expert witness, I find that Attorney Geraci's tactic in posing leading questions to Mahlmeister, only to later withdraw the questions upon Glen Oaks' objections,  created the misleading impression that the witness held opinions critical of the nursing staff on several matters that were never disclosed in discovery.  The majority concluded that this conduct did not amount to prejudicial error.  Slip op. at 11.  I submit, however, that the frequency with which Attorney Geraci engaged in this maneuver, when coupled with a multitude of other instances of unprofessional behavior, denied Glen Oaks a fair and impartial trial.

While by no means a complete catalog of Attorney Geraci's misconduct, other examples of his improper behavior include: (1) violating the trial court's 
in limine
 order barring him from suggesting that any of the medical records had been changed, altered, destroyed, or otherwise modified; (2) posing questions regarding Benjamin's father's salary as a machinist, his loss of pay from missing work to take Benjamin to see a doctor, and his inability to pay doctor's fees; (3) asking Sharon Driessen why she needed a lawyer to prepare for her deposition if she was not a defendant, whether she was amused by what she saw in Benjamin's mother's room when she arrived, and how Dr. Brewer could remain so calm when everyone else had their "adrenaline going"; (4) cross-examining Glen Oaks' life-care planning expert, Harry Brennan, in an argumentative, sarcastic manner; and (5) seizing an exhibit from Brennan.  The trial court recognized the impropriety of many of Attorney Geraci's actions and statements.  For instance, the court warned Attorney Geraci that he was being "very argumentative" and "extremely inappropriate" and that he needed to "lower the tone."  Indeed, the court went as far as suggesting that Attorney Geraci's conduct was intentional and cautioning Attorney Geraci that "the histrionics in front of the jury does create a cumulative effect that may ultimately be damaging."

I commend the trial court for gallantly trying to maintain courtroom decorum despite the unprofessional nature of Attorney Geraci's behavior.  I also note that the trial court attempted to safeguard the trial process by sustaining defense counsel objections and instructing the jury to disregard improper statements.  Nevertheless, where a party repeatedly engages in unprofessional behavior, the defendant may be prejudiced despite the existence of curative measures.  See 
People v. Slabaugh
, 323 Ill. App. 3d 723, 732 (2001).  In my opinion, the record demonstrates that Attorney Geraci engaged in a repeated, systematic, and intentional pattern of misconduct, the cumulative effect of which severely prejudiced Glen Oaks and requires a new trial.  I believe that allowing such pervasive, unprofessional misconduct to go unchecked not only encourages such behavior to continue but impedes the orderly administration of justice.  See 
People v. Libberton
, 346 Ill. App. 3d 912, 927 (2003) (Hutchinson, P.J., dissenting (in the context of prosecutorial misconduct)); 
West Chicago Street R.R. Co. v. Johnson
, 69 Ill. App. 147 (1897).  Accordingly, I respectfully dissent.